The Galveston City Co. v. Thomas J. Scott and others.

1. Galveston city stock. The scheme of association inaugurated by David White, in 1837, for the formation of a stock company for the sale of the land on which the City of Galveston is built, was never carried out by him so as to make those persons to whom he had issued stock partners under his certificates, in compliance with their terms; but it left those who held shares in the land by purchase from him for a valuable consideration, associates with M. B. Menard as part owners of the land.

2. Laches. The holder of "White stock" who was debarred by the action of the Galveston City Company from entering said company as a stockholder, cannot, after the lapse of more than twenty years, maintain an action to enforce a recognition of his stock, or for damages, as against said company, which had actual exclusive possession of the land belonging to said company from the date of its organization.

Appeal from Galveston. Tried below before the Hon. George B. Scott.

The plaintiffs, Thomas J. Scott and others, brought their suit against the Galveston City Company, May 15, 1868. They alleged the mortgage and power of sale by Menard to White, dated December 13, 1836, and annexed a copy as an exhibit to their petition, dated the 10th December, 1836. That, on the 2d February, 1837, said White, by virtue of said power of sale,

conveyed to Andrew J. Yates the one-thousandth part of said league and labor of land, which was conveyed down to the plaintiffs, by reason whereof plaintiffs became and are entitled legally and equitably, and owners of the one-thousandth part of said league and labor of land. Copy of this certificate of title and of the *mesne* conveyances were annexed to the petition. The petition alleged that, by means of this certificate they became entitled to all the rights represented and commonly known as certificates of stock in the Galveston City Company. It referred to the printed form of association annexed to their certificate, as showing the manner in which Menard and his associates held titles to shares of said league and labor of land on the 1st of September, 1838. It alleges the incorporation of the stockholders of the Galveston City Company February 5, 1841, which corporation still exists, and that plaintiffs are stockholders in said company. That in December, 1867, they presented their share of stock to be recognized as genuine and legal, which was refused by the company. Prays decree that it is a legal share of stock, and alleges damages at thirty thousand dollars.

Defendant answered June 4, 1868:

1. A general denial.

2. The conveyance of the league and labor of land to the trustees, June 15, 1837, to issue one thousand certificates of stock to represent the property (which were issued), and in right of which, from 1837, the trustees and the Galveston City Company, their successor, have held the property and exercised the rights of stockholders and company in exclusion and denial of and adversely to all other rights or claims, including plaintiffs'. That plaintiffs' claim had never been presented and was barred by laches.

3. That the trustees and company were purchasers in good faith, for valuable consideration.

4. Limitation of three, five, and ten years.

Plaintiffs, Scotts, then filed amendment, December 17, 1868. It alleged that the trustees took with notice of the mortgage and

power of sale to White, and that White had made sales of shares or interests in said land. That the issuing, by the trustees, of stock to the full value of said land, without reference to certificate No. 153, sold by White, was a fraud on the rights of plaintiffs, of which they had no notice until 1867, when they presented their certificate to the company, which refused to recognize its validity. That the company had concealed said fraud.

December 17, 1868, defendant amended, denying specially the original validity of the White share sued on, and that Menard ever conferred such authority on White, but that it was repudiated, and all power to White revoked as soon as known by Menard. Alleged the conveyance to the trustees, in disregard of and adversely to the acts of White and rights of those claiming under him; the issuance, by the trustees, of the entire one thousand shares of stock; the formation of the company and its subsequent incorporation; and that from 1837 to the time of suit the property had been held, and the entire action and proceedings of the stockholders and company conducted adversely to the right claimed by plaintiff, during all which time, for more than thirty years, the right claimed by plaintiff had been in no manner asserted or set up, but plaintiffs had been guilty of laches for that period, until now, when all the parties acquainted with the original transaction are dead, facts cannot be proved from lapse of time, and plaintiff's claim is invalid, fraudulent, stale, and unconscionable, and they pray the court to decree the share to be canceled or of no effect, and for general relief.

June 11, 1869, plaintiffs, Scotts, amended, alleging specially the authority of White from Menard to issue the share sued on, and that the said share and the acts of Menard and White were thereafter ratified by the company and their grantors. Prayer that the defendants issue to plaintiffs a share of stock in the company, or pay the value thereof and damages.

Same day plaintiff filed further amendment, alleging that the deed to the trustees of the 15th June, 1837, was in trust

for said Menard and his associates, by previous sale of shares or interests in said land, either direct from Menard or through the agency of White, and for subsequent purchasers of shares from said trustees, and that said land was so held in trust down to the time of the incorporation of the Galveston City Company.

Same day defendant amended and demurred to the original and amended petitions as showing no cause of action; if any, it was against the representatives of White or Menard; as showing laches and neglect barring their claim, and no excuse therefor; that the cause of action was not set forth with certainty; that all allegations of the acknowledgment or ratification of said share of stock or connecting defendant with it, and all allegations of fraud, were uncertain and general, and without specification of facts to give proper notice thereof, or enable defendant to answer the same.

Defendant also, in this and another amendment, set out the action of the Galveston City Company, and the trustees and directors preceding them in the management of the company, and of the property, in right alone of the one thousand holders of trustee stock, and to the exclusion of all other rights or claims; that this stock had issued to *bona fide* holders, and had been constantly transferred for value to other holders, whose rights should be protected from the laches of the plaintiffs.

Further, that Menard, assisted by White, in 1837 and 1838, had taken up and settled all *bona fide* claims under White, and that this claim was believed to have been either then equitably settled, or rejected as spurious or unjust. That since that time, no claimant of said White stock had been known; that the entire one thousand shares of trustee stock had issued *bona fide* to parties; and have been a subject of dealing and commerce, and they and their assigns and successors had ever since held the same, and all the property and rights of the company had been held under and by them adversely to all other rights, and that said plaintiffs in delaying any attempt to estab-

lish their pretended claim for more than thirty years, during which Menard, White, Yates and Allen, have all died, and all evidence of the original transaction been lost, have been guilty of such negligence and laches as should prevent other or further answer to their suit. That the allegations of fraud are too general to enable particular answer to be made, but were wholly without foundation or color. Prayer for dismissal of suit, cancelment of plaintiff's claim, and for general relief.

The evidence disclosed that all claim of title of the Republic of Texas to the league and labor of land on which the city of Galveston is now situated, was relinquished to M. B. Menard, and his associates, by Act of Congress of 9th December, 1836. This act was construed by this court as a grant intended for a town site. (23 Texas, 351.)   Menard was to pay for this grant fifty thousand dollars, and to provide for this payment to the satisfaction of David White, of Mobile, Alabama. On the 10th of December, 1836, Menard executed a mortgage, with power of sale of this league and labor of land to secure the payment to White of fifty thousand dollars, acknowledged to have been advanced by him. This instrument contained: 1st, A general mortgage for the repayment of fifty thousand dollars; 2d, A power therein to White at any time to sell a sufficient portion of the same to pay himself the said fifty thousand dollars; 3d, Recital of agreement with White, that he should assist Menard in the sale of the league and labor, which was contemplated to be sold in shares, lots, or such other manner as might be agreed upon, and receive ten per cent. of the proceeds over and above the fifty thousand dollars.

The previous grant of this league and labor of land, known as the Seguin title, was owned by nine other parties in conjunction with Menard, some of whom made sale of their interests, in whole or part. In February, 1837, Menard and his associates determined to make a joint stock of this property; organize a company, and issue shares of stock to represent the property, and proceed with the building up of the city of Galveston. They chose Dr. Levi Jones, who had become a pro-

prietor since the Congressional Act, as the agent for this Galveston City Company enterprise, and it was understood that in the latter part of March, 1837, Jones and Menard were to proceed North, effect the organization, issue the stock, put it in market, and initiate the enterprise. Jones reached New Orleans late in March, 1837. He there met Menard, and from him learned that David White, in the city of Mobile, Alabama, had formed the plan of a Galveston City Company, and was issuing and selling shares in this company. Menard had seen him; had denied his powers and endeavored to stop their exercise, but found White inexorable, and was advised by lawyers, that White's powers " were coupled with an interest;" and that he had Menard in his power.

Jones and Menard then went to Mobile and negotiated with White several days ineffectually. They published in the Mobile papers a denial and revocation of all powers on the part of White, who had then issued, as far as they could ascertain, one hundred and eighty-one or one hundred and eighty-three shares in this company—one hundred and fifty of them to Allen & Yates, who were among the co-proprietors—and thirty-one or thirty-three sold to individuals.

The evidence of Jones indicates that Menard denied White's power to issue these shares.

Menard and Jones proceeded to Richmond, Virginia. There they were met with another Galveston City Company enterprise. During the revolution, President D. G. Burnett, under the laws of the Consultation, had issued to David Triplett a title to six hundred and forty acres of land on Galveston Island, in the heart of the present city, and conflicting with the subsequent grant to Menard.

Jones testified, that doubt or controversy as to their title, would have rendered it wholly unmarketable, and the result was a compromise with Triplett, by which they agreed to give to the Virginia Company one-fifth of the stock to be issued. Conveyances were then made by Menard and Triplett of the joint title to this league and labor of land to trustees, W. R.

Johnson, Thomas Green, and Levi Jones, for the formation of the Galveston City Company. The property to be represented by one thousand shares of stock, to be issued by these trustees —the stockholders to elect directors, who should hold the land, survey it up, divide it into lots, etc., and proceed with their sale.

The plaintiffs contended that this trust-deed contained a legal recognition of each and every share issued by David White as valid shares, already executed and in existence, and entitled to recognition as part of the stock of the new company, and that those trustees and the subsequent company have ever since been in the recognition and under the obligation of this trust for the David White shares. The defendant, on the contrary, insisted, that whilst it was true, as a practical matter of business, that payment to White had to be provided for, and that what was supposed to be ample means for a settlement with White and claimants under him, were provided, that any recognition of the validity of the White stock would have been absurd, and was avoided in the most careful manner.

The entire one thousand shares of stock, representing all the capital and rights of the company were issued by the trustees —known as the "trustee stock." One of the books, of two hundred shares, was delivered to the Virginia parties. Another, Menard reserved to himself to settle with White and claimants under White, and reported in 1838 or 1839, that this was done, leaving about seventeen shares of that book, which were also issued in those years. The company continued to be managed by directors from 1838, and the stockholders were incorporated. From 1838 to the trial, the only stockholders ever known to the Galveston City Company, before or since incorporation, recognized by it, or represented by it in any manner or form, having vote, management or interest in the company, were the "trustee stock," issued by Johnson, Green, and Jones, or two of them, and its re-issues, since authorized. No such thing as David White stock had been known, nor, according to the evidence, would have been recognized as having any status or interest whatever. David White shares in Galveston City stock

were unknown to the agent of the company who had acted as such for fifteen years, and unknown to Green, one of the trustees. The company has never sold lots for cash, except to provide for its necessary expenses. It had only sold lots in exchange for and cancellation of its own stock. Every purchaser of a lot in the city of Galveston since 1838, from the Galveston City Company, had been required to become the owner of the stock of the company; and only by its surrender and cancelment, to an equivalent value in stock, could purchases be made.

A jury was waived, and cause submitted to the District Judge, who decreed in behalf of plaintiffs, requiring the Galveston City Company to issue to them a share of stock in said company.

The following instruments were read in evidence as constituting the basis of plaintiffs' right:

## " EXHIBIT ' C.'

" Whereas, the government *de facto* of the Republic of
" Texas, by an Act of Congress passed on the 9th day of De-
" cember, A.D. 1836, released and relinquished unto Michael
" B. Menard, a citizen thereof, and to his associates, to be
" thereafter included and appointed by him, all the rights and
" property of the said government of, in, to and out of a cer-
" tain league and labor of land lying and situated on, and in-
" cluding the east end of Galveston Island, within the limits
" and jurisdiction of said government, with a view to the set-
" tlement of the said lands as a town, subject, however, to the
" payment by the said Menard to the said government, of the
" sum of fifty thousand dollars, and subject, also, to a reservation
" by the said government of fifteen acres of land on the eastern
" extremity of said island, and of one square of lots in the said
" projected town, as by reference to the said Act of Congress
" will more fully appear. And whereas, the said Menard has
" paid the said sum of fifty thousand dollars to the said govern-
" ment, and is now fully and entirely seized and possessed of

" all the rights in the said land, saving the reservation afore-
" said, which were before the passing of the aforesaid Act of
" Congress in the said government, subject, however, to a
" mortgage for the sum of fifty thousand dollars (so as afore-
" said paid to the said government by the said Menard) to
" David White, to whom the said sum of fifty thousand dol-
" lars was advanced to the said Menard.   And whereas, the
" said Menard has, by a power of attorney duly executed on
" the 13th day of December, 1836, fully authorized and ap-
" pointed the said David White, to be his true and lawful
" attorney and representative for him, and in his name and
" stead to sell and dispose of the aforesaid one league and labor
" of land in such manner and on such terms as the said White
" may deem advisable, and to issue to each person purchasing
" any part or portion of the same, a certificate for the amount
" of interest so purchased, specially and particularly stating
" the interest so purchased, and particularly describing the said
" person so purchasing as one of his (the said Menard's) asso-
" ciates, under the Act of Congress aforesaid, and that such
" person so purchasing shall be entitled to receive a title for
" the portion of interest so puchased, direct from the Presi-
" dent of the Republic of Texas; and, whereas, it has been
" determined by the said Menard, the better to effect the ob-
" jects of said Acts of Congress, to divide the interest and
" estate of him, the said Menard, in the said land, into ———
" shares or portions, to be disposed of by sale to such person or
" persons who may be willing to purchase the same, and to
" associate themselves together under the stipulations and
" covenants hereinafter set forth.

"  " Now, this agreement witnesseth that the said Menard, by
" the said White, his attorney-in-fact, and the said purchasers
" whose names are hereunto subscribed, and such person or
" persons as may hereafter become purchasers, do covenant,
" promise and agree to and with each other and the heirs, ex-
" ecutors, administrators and assigns of each and every one of
" them, that they will well and truly keep and perform the

" several articles of association and covenant, touching the said
" land, and the management and disposition thereof, which are
" hereafter set forth, that is to say :

" *Firstly.* That the said Menard will, within a reasonable
" time after notice from a majority of the purchasers of the
" said shares or portions, make and execute to such persons
" as may be selected by a majority of the said purchasers, or
" by a board of directors to be chosen by such majority, a deed,
" in fee simple of his whole rights and estate in the said land
" in trust, for the use and benefit of the said purchasers, and
" their assigns, according to their several shares and portions,  ·
" and under the covenants, and subject to the stipulations
" hereinafter expressed.

" *Secondly.* That the said Menard and the said White for
" the said Menard, shall upon payment to him of —— dollars,
" lawful money of the United States, and a legal undertaking
" by such purchaser to comply with the terms in the hereby
" and hereinafter described form of the certificate to be issued,
" make, execute and deliver to every purchaser, a certificate
" for each share or portion by him purchased, in the following
" form, to wit,

" (For which certificate see below.) *

" *Thirdly.* That the said Menard, and the said White, shall
" not sell more than —— shares or portions of the interest in
" the said land, as hereinbefore provided and determined.

" *Fourthly.* That if, at the expiration of ——, the said
" Menard and the said White shall not have disposed of the
" whole number of shares or portions, into which, as hereinbe-
" fore provided, the said estate and interest is to be divided,
" that then the said Menard shall have and hold the number
" of shares or portions so remaining unsold, under and subject
" to the stipulations hereof, and shall thereafter dispose of
" them under and subject to the covenants and stipulations
" hereof.

" *Fifthly.* That on or before the —— the said Menard shall
" give notice to the persons who may at that time be share-

"holders by purchase as herein provided, of the number of
"shares up to that time sold, and that within —— after the
"receipt of such notice, a majority of the shareholders, by per-
"son or proxy, shall appoint from among the holders of at
"least five shares, —— directors, who by such appointment
"shall become, and are hereby declared to be, the attornies-in-
"fact of the whole number of holders of shares, and by them
"authorized to make such contracts and order such improve-
"ments, surveys and layings out of the said lands, as, in their
"discretion, they may deem most advantageous for the interest
"of all concerned. The approval of a majority of the said
"directors shall sanction their acts.

"*Sixthly.* The majority of the shareholders shall be reckon-
"ed by interest, each share counting one vote.

"*Seventhly.* That the trustees, hereinbefore provided for,
"shall, upon a request in writing, signed by a majority of the
"directors, make good and sufficient titles in law to the several
"persons who shall from time to time become purchasers of
"portions or lots of the said land.

"*Eighthly.* That a majority of the directors shall fix and
"direct the time, place, manner and quantity of sales of the
"land and in such form of lots and plots as they may deem
"most advantageous for the general interest of those concerned.

"*Ninthly.* That the proceeds of the sales of shares or
"portions of interest, as herein provided, shall first be ap-
"plied (so far as necessary for that end) by the said Menard to
"the payment of the fifty thousand dollars due upon mort-
"gage as aforesaid to said White.

"*Tenthly.* That the proceeds of sales of lands shall from
"time to time be divided by the directors, and paid ratably
"so much per share to the shareholders, at the time of such
"division.

"*Eleventhly.* That the office for the transaction of the busi-
"ness of the association, shall be kept at such place as the
"directors may appoint.

"*Twelfthly.* That all transfers shall be made in writing

35

" under seal, specifying the number of shares transferred, and
" that the transferee takes the interest coupled with the stipu-
" lations and covenants herein contained.

" *Thirteenthly.* That at a convenient time, the directors for
" the time being shall apply to the Government of Texas for
" an act to incorporate the said shareholders in such form and
" with such provisions as a majority of the said directors shall
" approve.

" *Fourteenthly.* That on —— a majority of the shareholders
" for the time being shall in each and every year, in person or
" by proxy, elect —— directors, from among the shareholders
" who at the time being shall be proprietors of at least five
" shares, which directors so chosen shall serve and continue in
" office until the next annual election, or until a new board shall
" be chosen.

" *Fifteenthly.* That the said Menard, and the said White,
" shall forthwith cause a true copy of these articles and docu-
" ments therein referred to, to be placed on file in the office of
" some lawfully commissioned notary public, in the city of
" Mobile, and another true copy thereof to be deposited within
" the city of New Orleans, and shall forthwith transmit this
" original to the Secretary of State of the Republic of Texas,
" to be by him recorded in the appropriate office.

" *Sixteenthly.* The sum of —— dollars is hereby agreed
" upon and fixed as stipulated damages (and not as a penalty),
" to be recovered for a breach of any of the articles or cove-
" nants hereof, of and against the party in default, in the
" names and for the use of the shareholders not in default at
" the time being.

[* CERTIFICATE No. 153, BOOK A.]

" This is to certify that I, Michael B. Menard, by my there-
" unto legally constituted attorney-in-fact, David White, for
" and in consideration of the sum of five hundred dollars, to
" me in hand paid before the sealing and delivering hereof, do

" hereby grant, bargain and sell to Andrew J. Yates, his heirs
" and assigns, one-thousandth part of my estate and interest in
" the league and labor of land situated on and including the
" east end of Galveston Island, and granted to me by the Gov-
" ernment of Texas, by Act of Congress, passed on the 9th day
" of December, Anno Domini 1836.   And I do hereby include
" and nominate and create the said Andrew J. Yates my asso-
" ciate, under the provisions of the said Act, and lawfully
" authorize him by all necessary means, by the use of my name
" or otherwise, to pursue and receive from the said government
" of Texas, according to the provisions of the said Act, a per-
" fect title to the same; provided, that the said Andrew J.
" Yates or his assigns shall and do well and truly pay, or cause
" to be paid to me or my lawful attorney, or my executors,
" administrators, or assigns, the further sum of ———.   And
" in default of any of such payments that the said estate and
" interest hereby granted shall revert in me as of my first and
" former estate; and provided, also, that the said Andrew J.
" Yates shall have and hold the said interest and estate, under
" and subject to the articles of covenant and association made
" and entered into by and between me and my other associates,
" purchasers of my former and remaining interest in the said
" land.

" In witness whereof, witness my hand and seal this second
" day of February, A. D. 1837.

" (Signed)   DAVID WHITE. [L. S.] "

*Bellenger, Jack & Mott*, for appellant, filed an able and
elaborate brief, which, like those of Messrs. Gray & Botts, Hall,
and Goddard, who were also for appellant, is too lengthy for
insertion.   They insisted that the facts in evidence, which will
be found in the statement of the case and in the opinion of the
court, brought the plaintiffs fully within the bar of limitations
and stale demand, as settled by the following decisions:

(Hemming *v.* Zimmerschitte, 4 Texas, 159, 169; De Cordo-
va *v.* Smith, 9 Texas, 129, 146, 148–150; De Witt *v.* Miller, 9

Texas, 266, 267; Watson *v.* Inman, 23 Texas, 536; Barrett *v.* Kelly, 31 Texas, 480; Tinnen *v.* Mebane, 10 Texas, 246, 252–256; Wingate *v.* Wingate, 11 Texas, 434, 435; Smith *v.* Hampton, 13 Texas, 459; Glasscock *v.* Nelson, 26 Texas, 150; Hunter *v.* Hubbard, 26 Texas, 537, 546–548; Mosely *v.* Withie, 26 Texas, 728; Carroll *v.* Evans, 27 Texas, 262; Bailey *v.* Trammell, 27 Texas, 328; Carlisle *v.* Hart, 27 Texas, 350; Brown *v.* Guthrie, 27 Texas, 610, 611; Peeler *v.* Guilkey, 27 Texas, 355, 358; Yeary *v.* Cummins, 28 Texas, 94, 95; Angell on Limitations, S., 472; Same, S., 174; Badger *v.* Badger, 2 Wallace, S. C. U. S., 87.)

That if fraud and want of knowledge or notice is in question, "the right of action shall be deemed to have accrued to "plaintiff, when such fraud shall be, or by reasonable diligence "might have been, discovered. * * A party affected by fraud "shall be presumed to have actual knowledge of it at the time, "when, by reasonable care, it might have been detected by him." (Smith *v.* Talbot, 18 Texas, 782, 783, re-affirmed, Smith *v.* Fly, 24 Texas, 352, 353; Angell on Limitation, S., 187.)

That limitation runs between partners, citing Landsdale *v.* Brasher, 3 Monroe, 332; Prewett *v.* Buckingham, 28 Miss., 93; Partnership in Stocks; Atwater *v.* Fowler, 3 Edw. Ch'y R., 417.

That limitation runs in favor of trustees to convey stocks who commit a breach of trust. (Maryland Ch'y R., 56.)

*Flournoy & Sherwood,* for appellees. We assert, and challenge contradiction upon principle or authority from any court of law or equity, that no doctrine of "laches," or "lapse of "time," can be imputed by a copartnership, or a joint-stock company, or an incorporated body, as against one of its members, because of neglect in asserting the rights and privileges of membership (after having fully paid his proportion of the capital stock) unless it hath been provided in the original articles of association, or at some time been provided for by the association pursuant with (or at most not in opposition to) the

plan and purpose of the association, and due notice of such action given the members thereof; that they should do or omit something that would continue them in recognition as members and in interest, or oust them therefrom.

And we further assert, as incontrovertible, that unless it be shown that the holder of the certificate sued on in this case has done something prohibited (if anything could be prohibited) or omitted to do something commanded (if anything could be commanded), which was the prescribed touchstone to determine whether he should thereafter be regarded as a member of the company, the court is bound to regard him (as the company have always done to December, 1867) as in full membership. To consider laches, there must be some period of time from which to commence the count of years. When shall it be? The contract was completely executed when the certificate was paid for and delivered. We had nothing to do within any time whatever to perfect our interest. Nothing could have been demanded of us, except in the event of the dissolution of the company or its total repudiation of the scheme of its organization.

This was not the case.   She went on waxing strong by constant but modest growth; gave no notice that dividends would be declared, because none have ever yet been declared.   Such of its members as saw fit, united in the election of its officers and its general management.   Possibly, not one-half of the stock has ever indicated its existence by the participation of the owner in any of the public or private acts of the company. Never until December, 1867, when we presented our certificate of stock, had anything been done, with or without notice, or pretended to have been done, tending to indicate a repudiation of our membership.   The company may have thought all the White certificates taken up and substituted, but never did they dream of denouncing one or more that had not been taken up, but, seemingly, was ever ready to recognize them, until December, 1867.   This, then, is the period of time from which the count of years shall begin.   The very records of the com-

pany are a complete replication to the plea of laches, even upon the precise hypothesis out of which the doctrine of laches has grown. It is said to have become the settled rule of courts of equity to regard that as right which had been universally recognized as right for more than thirty years, and that contracts cannot be enforced, nor rights or privileges asserted or disturbed, when the seal that covered their origin bore the impress of thirty years, because it is said the courts will presume in favor of the party who has thirty years to back the assertion of his right, upon the hypothesis that witnesses contemporary with the original transactions will ordinarily have died, and evidence become lost or destroyed within that period.

This cannot be the rule in the case at "bar." The certificate of stock has always been, and still is, the only evidence of right to a share. This certificate has never been lost; nor are we attempting to establish our right to one after thirty years. We present the original document itself; and all the evidence (except as to value) connected with it, or embraced in the record, is matter from among the archives and books of the company themselves.

So even if this had been a case wherein laches could apply, the application could not be made, for the very reason upon which the plea would be allowed does not exist. The consideration of the loss of evidence cannot be entertained by the Court.

2. But the appellants were never our trustees. Their officers (whom we do not sue for breach of trust) were. The company were, and are, a whole, of which we were and are one integral part. We were not compelled to be an active member, unless we so desired.

If dividends had ever been declared, and we had delayed—say thirty years—to demand our share of them, we would be chargeable with laches, and our associates could not be held responsible for our particular dues, especially if they have been diverted or novel interest have grown up through our indifference and delay. This has never been held to apply beyond the

dividends.  A share of stock is something that moth and rust doth not corrupt, nor mere time enable a company to break through and steal.  Nothing but a dissolution of the company, and a destruction of the capital stock can ever oust the interest of the holder.  A share—once paid for—can never be touched, except by the overt act of the owner.

We respectfully challenge the reference to a single case, either from a court of law or equity, wherein a stockholder in a corporate or joint-stock company has ever been held to lose his interest in the capital stock through "lapse of time," or laches, in the assertion of such interest.   And yet this is precisely what this court is asked to do, for the first time in the jurisprudence of any civilized country.  If we were ever a stockholder (which is admitted substantially), we are so still.

If we were and are, what are our rights? and what should we expect from the court in the premises—this highest tribunal of justice?   The case in the court below was tried by the Judge, a jury having been waived; and, therefore, if there be error, but not such as to justify reversal, this court, according to custom, will reform and render, without remanding.

This, we think, we have the right to ask upon this particular point.   The evidence of the Secretary of the appellants—the only witness testifying upon this point—shows that at the time we demanded a recognition of our stock, so as to enable us to place it upon the market, shares were worth, when sold altogether, ten thousand dollars; when divided and sold, fourteen thousand dollars.   Had our share been recognized and a certificate in present marketable form substituted, as we demanded, and as had been done with all others, we could easily have divided it and sold it for fourteen thousand dollars.  The company undertook the responsibility of refusal to issue us a share (or certificate for a share) in the form we had the right to demand, and thereby unjustly and illegally deprived us of the use of fourteen thousand dollars.   This the company should be adjudged to pay us, together with interest, from day of presentation, demand and refusal—say from 1st January, 1868, to day

of judgment—the demand having been made some time in December, 1867.

Could we have shown a higher value in shares since that time, we would be entitled to a decree for the highest, because we could have exercised our option to hold or sell. We had the right to sell at the highest figure (say fourteen thousand dollars) proven, and could have used our money ever since.

We therefore ask a final decree for fourteen thousand dollars, with interest from January 1st, 1868, at eight per cent. per annum, against appellants. We should not now be forced to accept the share, after having been forced to so much expense and delay, and after the stock has depreciated. The option should be with us as to which we would receive, under the decree, and not with the company as to which they would now tender.

We respectfully refer to the following authorities as precisely in point: (Randon v. Barton, 4 Texas, 289; Calvit v. McFadden, 13 Texas, 324.)

ROBERTS, C. J.   The appellees obtained a decree establishing their right to a share of stock in the Galveston City Company, as now existing and acting under its act of incorporation, from which an appeal has been taken to this court. The jury was waived and the case submitted to the court upon the pleading and evidence, and it is assigned for error that the decree was not justified by the evidence under the law applicable thereto. There were various exceptions taken to the pleading and to the evidence, which, being overruled, are also assigned as error.

Without considering the questions arising upon these exceptions, for the present, it is believed that a satisfactory conclusion may be arrived at by a proper construction of the written instruments upon which the suit is founded, in connection with the evidence adduced in explanation of them.

The first question that presents itself is, what is the legal import of the certificate sued on, and what right did it vest in the holder when issued by White as the agent of Menard? It

is an instrument in the nature of a deed of conveyance for an undivided interest (the one thousandth part) of a league and labor of land, on, and including the east end of Galveston Island, to be held subject to certain articles of covenant and association with other persons, who should hold similar deeds for shares in said land, which articles were attached to, and made a part of the deed, and prescribed the terms and contingencies upon which such association was afterwards to be formed, as well also as the objects of such association, when it should be formed and put into action, which were to lay off and erect a city upon said land, for their mutual and joint profit. It made him an associate with Menard and other holders of like instruments, as a part-owner of the land then, obligated by a concurrent agreement to become, upon certain contingencies and terms (some of which were expressed and some not), an associate with Menard, and such others, as a co-partner in a partnership in the shape of a joint-stock company, to be organized for the possession, management, and disposition of said land, in the erection of a city. There is upon the face of this instrument, when regarded as vesting in the holder a part-ownership of the land, a condition subsequent, which put it in the power of Menard to vacate it, upon failure of compliance, and that was the payment of an additional sum in blank, if indeed an additional sum over that of five hundred dollars was contemplated to be paid, according to the scheme of which this instrument was a part, under the direction of White, as the agent of Menard. This is not referred to as constituting of itself a want of title to part-ownership, but to show that it left a door open for Menard to set up and claim a want of compliance, if, in fact, an additional payment was contemplated in any subsequent adjustment of such right that may have been made by him.

The next question is, how was this interest of part-ownership to be changed into a partnership interest in the land?

By Menard giving notice to the shareholders at some time thereafter not named (being a blank in the articles), of the

number of shares then sold, after which the shareholders should appoint directors who should be the attorneys in fact of all the shareholders in the management of said business, and whose appointment might be renewed every year, in person or by proxy, of a majority of the shareholders. And a majority of said shareholders, or the board of directors appointed by them, might require Menard, upon notice given to him, to execute a title to said land to trustees selected by them, to be held in trust for the shareholders or their assigns, and to be disposed of in lots under the direction of the board of directors.

But so far as the evidence shows, Menard never gave any such notice, and the shareholders never appointed any directors, and Menard never executed a deed of trust to the land to trustees, named and appointed by the said shareholders, who held certificates of shares under Menard, through his agent, White. The association so as to make the part-owners or shareholders, under the scheme attempted to be carried out through White, wholly failed. It was abandoned by Menard himself in pursuit of another, and White himself, after issuing one hundred and eighty-one or one hundred and eighty-three certificates of shares, upon what terms and consideration does not fully appear, ceased to operate upon said scheme, and never, so far as appears, even attempted to form an association by a meeting of the shareholders of his certificates, but instead of that, finally acquiesced in, and took stock in another association, which supplanted his scheme ; which fact is mentioned here now only to show, by affirmative evidence, that he never carried out the scheme of association inaugurated by him, whether right or wrong, so as to make the persons associates as partners, by virtue of their acts under his certificates, in compliance with their terms.

So far then as this point is concerned, up to the period thus far considered, it is perfectly immaterial whether White's scheme of ultimate association was sanctioned in its origin by Menard or not. The failure of his scheme left those who held, by a full valuable consideration, shares in said land from him,

associates with Menard as part-owners, but not associates as part-ners, by virtue of the certificates or deeds issued by him, and so they may continue to be up to the present time, if he had full authority, as would appear to be the case from his mort-gage and power of sale, to do what he did, as to selling the land, unless such right has been submerged into some other, or they have lost it by limitation or laches, pleaded or to be pleaded as a bar to them.

It is contended by plaintiffs below, that the holder of the share one hundred and fifty-three in book A, issued by White, upon which this suit is brought, was fully recognized as a valid right by the deed of trust, made at Richmond, by Menard and Triplett, in compromise of their conflicting interests; and that by said recognition, the holder of said certificate became an equal partner in the association, afterwards formed at Galves-ton, styled the Galveston City Company, in pursuance of the terms of said deed of trust to Jones, Johnson & Green.

It will be seen that the first branch of this proposition might be true without its being at all necessary that the second branch of the proposition should follow from it.

To appreciate properly each branch of the above proposition, and their true relation to each other, it is necessary to consider that this league and labor of land was granted by the Congress of Texas to " Menard and such associates as he may hereafter " include," for the purpose of building a town upon it; that Hardin, Yates, Allen, Baker, Jack, and others, to the number of nine, who were in some way concerned with him in the grant, not disclosed in this record, were silent owners of some sort of interest in it, and that they were not the persons designated in this act, as the associates that he might thereafter include in the grant. From the mortgage to White, and the obligation to Hardin, both only a few days after the grant, it reasonably ap-pears that these nine silent owners of an interest confided the title to the land, and the management of the enterprise to Menard, holding him responsible only for their shares of the net profits of it, and that some such scheme as that which was

afterwards put forward by White, as his agent, was contemplated, without its exact terms being settled, which is evidenced also by the generalities, as well as the blanks in the certificates issued by White.

The basis of the scheme was that Menard should continue to hold the legal title to the land until an organized association was formed by the shareholders, who were to be associates, by him thereafter included, and until they, or the directors appointed by them, should notify and direct him to convey the legal title to trustees selected by them, thereafter to be under their control; and also that White should assist Menard in the sales of the shares, and, after he was paid his fifty thousand dollars advanced by him, have "ten per cent on the amount re- "maining in consideration of his services." It is equally probable that White had five books prepared, with two hundred certificates of shares similar to one hundred and fifty-three of book A; for by reference to the Menard papers in evidence White speaks of turning over five hundred shares and retaining enough to make himself safe. And again, on the 7th of March he speaks of "the balance of the unsold stock of the Galveston "stock, together with the stock-book C," being turned over to Menard upon certain conditions. It appears that Allen and Yates, two of the silent owners of interests in this land, not content to leave the enterprise to the management of Menard, went to Mobile early in March, 1837, and drew out from White their proportional shares. Allen drew out one hundred shares, and paid White five thousand dollars. Yates drew out fifty shares, and paid by his note two thousand five hundred dollars. Whether this payment was their proportions of the fifty thousand dollars due from Menard to White, or only the ten per cent. commissions on them, treating them as sales of stock by White, it was throwing the stock upon the market in a way to produce competition in the sale of it by such of the original owners as might choose to break off from Menard, and which would inevitably, in a short time, run down the price of it, and most probably put it out of Menard's power to pay the debt to White, for

which he had made himself personally responsible.   In addition
to this, he had in trust the interest of those joint-owners who
still confided in him.   Hence, when he met Jones in New
Orleans, the first week in April, 1837, just having come from
Mobile, he was dissatisfied with White's arrangements, and
when he and Jones could not alter them, he determined to re-
pudiate them, of which he then gave notice in the newspapers,
and coming back to New Orleans on the 11th day of April,
1837, entered into an agreement of compromise with Triplett,
who, with his associates, had a claim to six hundred and forty
acres on the east end of the island, which was consummated on
the 18th of the same month by a deed of trust from Menard
and Triplett to Johnson, Green, and Jones, to the said six
hundred and forty acres, and by Menard to Jones for the bal-
ance of the league and labor.

This scheme contemplated a coöperative, though not in all
respects a joint plan, for the sale of stock, shares, and scrip,
through said trustees.   It made no reference whatever to the
White shares, or to White, further than to provide that Jones
should pay him the balance of his debt out of the first sales of
stock.   Menard at once parted with the legal title to the land,
which of course was entirely inconsistent with his thereafter
performing what was expected of him, in forwarding the per-
fection of the association in the White scheme.   This scheme,
originating in the compromise, also failed, and never matured
into the formation of a joint-stock company.   It is probable
that Dr. Jones went to work under this plan in the erection of
a city, for we find in the subsequent arrangement founded on this,
that a sale by him of ten squares or parts of squares was expressly
ratified.   But the compromise was remodeled in Richmond, Vir-
ginia, by articles of agreement between Menard, Triplett, Neblett,
Gray, Green, and Jones, on the 15th day of June, 1837, by which
the legal title to the whole of the league and labor of land was
conveyed to Johnson, Green, and Jones, in fee simple, as trus-
tees and commissioners, to execute and carry into effect the
purposes, terms, and intentions of the agreement then entered

into. It was provided therein, " that said league and labor of " land shall, by the said trustees or commissioners, be divided " into one thousand shares, of which the four hundred shares, " for which certificates have already been issued by the said " Jones, shall be regarded as four hundred shares, and the law- " ful holders of said certificates shall be on the same footing, " and entitled to the same rights with the holders of certificates " issued under the present articles, and upon surrendering their " said certificates, new certificates in lieu thereof shall be issued " by the said commissioners or trustees." It provided that the remaining six hundred shares should be sold by the trustees in such manner as they should deem expedient, the proceeds of which were to be divided in the proportion of one-third to Triplett, and those claiming under or through him, and two-thirds to Menard, and those claiming under or through him.

It provided, that out of the first proceeds of the sales, after paying the expenses of the trust or commission, the debt to White, believed to be less than fifty thousand dollars, should be paid, and one-third of which amount should be paid to Triplett, or those claiming through him.

It provided for the regulation of the price of the Jones certificates still not sold, and that it should not be less than others sold for, and also provided for each party having an interest, to take certificates for it without paying money.

It provided that the trustees, when they thought enough certificates of shares had been sold, should call a meeting of the shareholders, and in such meeting Menard should represent the unsold Jones certificates, and two-thirds, and Triplett one-third of the unsold certificates of the remaining six hundred, and that the trustees should hold the land subject to the orders of the shareholders.

This instrument has been thus extensively quoted to show that almost every provision requires the exhibition of outside facts to make its terms intelligible. For instance, if the trustees should divide the land into one thousand shares, how are the six hundred to be numbered, and how many books of certifi-

cates were then made ?  If Jones had already issued four hundred certificates, how was it that some of them were unsold, and must not be sold at a less price than other certificates, and while unsold to be represented by Menard, upon a meeting of the shareholders ?  The evidence of Green explains, that the whole of the one thousand certificates of stock were drawn up and signed in five books, A, B, C, D, and E, four hundred of which ·in books A and B, were given to Menard at once, two hundred in book E, was kept by him "for parties in interest "under Triplett," and four hundred were delivered to Dr. Jones.

The evidence of Jones shows that he had never previously issued any certificates, and that his name in that respect is a fiction in the deed.

Green says that books A and B were for four hundred shares, to or by Dr. Levi Jones or Menard, before the compromise, and which were to be renewed for uniformity in the new plan.  If we examine the certificate one hundred and fiftythree of the book A, spoken of by Green, we will see that it was issued by Jones, Johnson, and Green, trustees, "in consideration of the return of the certificate of corresponding book and number, as formerly issued by said Levi Jones (one of the first four hundred shares)."  As Jones did not issue it, we naturally search for the certificate No. one hundred and fifty-three, in book A, that was issued by some one having some connection with this matter, and in doing so, by the aid of Dr. Jones's evidence, we find it in White's book, A, made previously.

Dr. Jones says that book A was given to Menard to settle with those who held certificates of shares under White, and the form in which they were written is consistent with that object. The reasons why White's name was not mentioned may well be supposed to be, that White had not consented to this scheme, which was being organized in direct hostility to his own, and he, and those holding his certificates, might go on to organize under his plan ; that Yates and Allen, original owners of an

interest, had drawn their full share under the White plan, and much more than they would be entitled to under the new scheme under the compromise with Triplett, which would require Menard, in justice to himself and his other original co-proprietors, to have equitably settled with them, and those who might hold under them; that if litigation arose between the parties, then standing in direct antagonism, the use of Jones's name would not commit the new combination to a recognition of the White scheme; that if there could be a satisfactory arrangement made with White, and those who held under him, to come into the new scheme, an easy way was provided for an equitable deduction of their claims if necessary, and a substitution of certificates out of the new book A, and thereby, as Green says, preserve a uniformity in the shape of the stock.

All this is strongly indicated inferentially in the provisions of the trust-deed, which recognized unsold Jones stock in the hands of Menard, and to be represented in the meeting of stockholders by him, and in the prohibition of such Jones stock being afterwards sold under the regular price of stock, which was fixed in the outset at fifteen hundred dollars per share.

Now if it be legitimate to explain this fiction in the trust-deed, and show that it was introduced with reference to the interest of White, and of those who held under him, which it is thought would certainly be proper under appropriate pleadings for that purpose, it is equally legitimate to explain, as Dr. Jones does, how, and through whom, their interests were to be managed, so as to introduce them into this new scheme as stockholders and partners, and that results in showing that it was to be done by a settlement and equitable adjustment with Menard, requiring both consent and action on their part, as well as his. Those who held under White, being then only part-owners, it certainly required their assent and action, in complying with the prescribed terms of surrendering their certificates, that constituted a charge on the land, in order to introduce them into the new scheme of association as partners.

Under this scheme the stock was disposed of, and the association was organized by the stockholders, who held what is termed the Trustee Stock, and by those only, who took actual exclusive possession of the land, and proceeded to carry out the objects of the association.     White, Allen, Yates, and others holding White stock, came into it, and received stock under it. The White scheme, as an association of stockholders, never was formed at all.

These were the persons who were incorporated as "the "stockholders of the Galveston City Company, under the "same name and style," on the 5th day of February, 1841, at which time there were only ten certificates of the trustee stock, of book A, in the hands of Menard, which, on the 7th of May, following, were issued to Origin Sibley, and William Dennis, who had bought and paid for five shares each in 1837, from White, at the rate of five hundred dollars per share.     The certificate number one hundred and fifty-three, of the trustee stock with others, was issued by Menard, by order of the Board of Directors, to Dr. Jones in payment of his services.

Thus was the door closed, certainly by the 7th of May, 1841, that had been provided, through which the holder of the White stock, number one hundred and fifty-three, now sued on, could enter said organized company as a stockholder, by the means that had been provided for that purpose, under its terms of association, as the Galveston City Company.

If then he was wrongfully debarred, he had a cause of action for damages, or he might have elected to prosecute his right to a part of the land, and claim partition.     Had he made this claim while Menard had in his hands certificates devoted to the purpose, under the provisions of the association, he might, upon establishing a *bona fide* right to this share, have forced his way into the company, as a stockholder, by a decree of a court.

But such a suit now, or a suit in the alternative for damages, after the lapse of more than twice the length of our longest limitation, and after nearly every person is dead, who, if alive,

could make plain what must now be dimly seen, must be held to be barred as a stale demand. The principles of law involved in this exposition of the case, pertain mainly to the well-known distinction between a tenant in common or part-owner of an interest in land, and a partner or stockholder in an incorporated real-estate joint-stock company, and the means by which the one or the other position, in relation to persons and property, may be assumed or created.

In its application to the facts of this case, we think the court erred in rendering a decree in favor of the plaintiffs below.

The exceptions of defendant below to the admission of transfers of the White certificate, No. 153; the alleged deficiency of evidence of the right of Mrs. Scott to recover as the widow of one of the Scott brothers; and the alleged error of the court in not sustaining defendant's special exceptions to plaintiffs' general allegation of the ratification of their right by the defendant, are all questions, the law of which is well settled, and present no great difficulty, except in the application of it to the particular facts of each case, which may vary in each trial of the same case, and therefore it is hardly necessary to say anything upon them.

The judgment is reversed and the cause remanded.

Reversed and remanded.