# JUNE, 1914.

## S. M. YEAMAN ET AL. V. GALVESTON CITY COMPANY ET AL.

### No. 2336. Decided June 3, 1914.

**1.—Corporation—Charter—Stockholders.**

A charter granted in 1841 by the Congress of Texas (Act of Feb. 5, 1841, Laws of Republic, Fifth Congress, p. 122) enacted that "the stockholders in the Galveston City Company be and they are hereby incorporated under the same name and style," and contained no other provision for capital stock or for subscription thereto. Held, that this gave to the shareholders in such company, theretofore an unincorporated joint stock association, the standing of stockholders in the corporation, and it was necessary to look beyond the Act itself to ascertain who such shareholders were. (Pp. 415-424.)

**2.—Same—Assent of Stockholder.**

Though the relation of stockholder is created by contract, and the assent of one holding shares in an unincorporated association was necessary to his assuming the relation of a corporate stockholder, yet where the charter was procured for the benefit of such shareholders their assent to assuming the position of stockholders therein should be presumed. (Pp. 418, 419.)

**3.—Same—Shareholder—Certificate.**

The certificate of stock in a corporation or in a joint stock company is not the stock itself, but mere evidence of ownership thereof; and to one who has done all that was necessary to entitle him to rights as a shareholder in the enterprise the issuance of a certificate is not necessary to entitle him to a stockholder's rights. (Pp. 419-421.)

**4.—Same.**

The owners of real property conveyed it to trustees authorized to issue certificates in a joint stock company for handling and disposing of it to purchasers. Subsequently the company was organized by the election of directors and officers by such holders of certificates. Held, that purchasers of such certificates became, by their ownership, stockholders in the company; and they did not lose that status by failing to comply with an order of the directors providing for opening stock books and issuing certificates of stock and requiring the holders of such trustee certificates of shares to surrender them and receive certificates under the seal of the company therefor, transferable on its books and declared necessary in order to entitle such holder to receive dividends. They were still included among the stockholders of the joint stock company, and by the adoption of an Act creating its stockholders a body corporate they became members of and stockholders in such corporation. (Pp. 424, 425.)

**5.—Same—Unsold Shares.**

Owners of land conveyed it to trustees and these to a joint stock company (subsequently incorporated) with 1000 shares to be sold to purchasers. Held, that the shares of stock, not the land itself, constituted the capital stock of this company; the land became the joint property of the company,—its capital, as distinguished from its capital stock; the ownership of all unsold shares remained with the original owners of the land who had contributed it to the enterprise; and it was immaterial whether the company itself took over these shares from such owners, or permitted them or their trustee to continue to sell them. (Pp. 421, 422.)

**6.—Cases Discussed.**

Galveston City Co. v. Scott, 42 Texas, 535, and Galveston City Co. v. Sibley, 56 Texas, 269, discussed and followed.  (Pp. 422, 423.)

**7.—Corporation—Directors—Rights of Stockholders.**

A resolution by directors of a corporation that the holders of certain certificates of stock should not be permitted to vote or draw dividends thereon until they should surrender them and receive new certificates therefor in accordance with the by-laws of the corporation, was not a repudiation of the status of such persons as stockholders, but rather a recognition of it.  It was not such a denial of their right to be regarded as stockholders as to set in motion the statute of limitation against any action by them to enforce their rights as such.  (Pp. 424, 425.)

**8.—Corporation—Stockholders—Notice.**

A corporation is a trustee of the interests of stockholders in its property, and if an act repudiating their rights is to have the effect of setting limitation in motion against them it should be clear and unquestioned and the parties to be affected should have notice thereof.  (P. 425.)

**9.—Stockholder—Dividends.**

A stockholder is under no obligation to take his dividends, but may leave them with the company, and is not chargeable with laches or limitation in so doing until he has demanded and been refused payment, or had knowledge of their misappropriation or of the denial of his rights.  (P. 426.)

**10.—Stockholder—Limitation.**

The owner of certificates showing his right as an original incorporator in a corporation died in 1853, the certificate being lost and nothing indicating his ownership to his heirs, who remained ignorant thereof until 1909, when the corporation took steps repudiating their rights as stockholders.  Held, that they were not barred from an action instituted in that year to establish their rights as owners of such stock and to the dividends thereon.  (Pp. 426, 427.)

**11.—Case Stated.**

In 1837 owners of land, in order to promote the development of a town thereon, conveyed it to trustees authorized to sell stock to the extent of 1000 shares in a company to manage its sale.  The trustees sold shares of stock and issued certificates therefor to purchasers, the ownership of unsold shares remaining with the original proprietors, subject to disposition by the trustees. In 1838 the company was organized by the shareholders as the Galveston City Company, directors and officers elected, its incorporation authorized, and provision made for the surrender of the trustee certificates by their holders in exchange for shares of stock issued by the company, which had acquired title to the land.  This company, up to that time an unincorporated joint stock association, obtained in 1841 a charter by Act of Congress (Laws of Republic of Texas, 5th Cong., p. 123.)  The only provision as to stockholders or designation of the persons incorporated was as follows: that "the stockholders in the Galveston City Company be and they are hereby incorporated under the same name and style."  Five outstanding shareholders certificates issued by the trustees to T., one of the original proprietors of the land, were never surrendered or exchanged for stock of the corporation.  T., a resident of New York, died in 1853, his trustee certificates having been lost and title thereto descending to residuary legatees who remained ignorant of any interest in the company up to 1909.  Various acts of the corporation recognized these trustee certificates as outstanding obligations; but in 1856 a resolution of a stockholders meeting provided that their holders should not be entitled to draw dividends or vote at stockholders meetings until they surrendered such certificates and received stock therefor as provided in the by-laws of the corporation; and notice of this resolution was published in New York, Richmond and New Orleans papers.  Various dividends were paid to the stockholders from time to time, not participated in by the holders of these trustee certificates.

In 1909 the remaining lots belonging to the company were sold to its president and chief stockholder and steps taken to dissolve the corporation and distribute its assets to the stockholders, disregarding any claim of those holding the interest represented by the trustee certificates once issued to T. These claimants, in the same year, then first obtaining information of their rights, sued to set aside the final sale of the corporate property, and to establish their rights as stockholders in the final distribution and also to their share of previous dividends paid to stockholders in which they had not participated. Upon questions certified upon their appeal from a judgment sustaining exceptions to their petition setting up these facts, it is held:

(1) The owners of such trustee certificates became by virtue thereof stockholders in the defendant corporation, by the terms of its charter.

(2) The four years statute of limitation was applicable to their action; but under the allegations of their petition did not bar it.

(3) Under such allegations defendant's exceptions asserting the defense of laches and stale demand were not well taken.

(4) Certain allegations of plaintiffs' petition as to recognition and ratification of their rights by defendant corporation, and of their ignorance of and time of obtaining knowledge of their rights, are held sufficient as against special exceptions.

(5) Under the allegations of the petition plaintiffs were entitled to an accounting from the corporation, and this not merely for their proportionate share of the assets still on hand. (Pp. 398-427.)

Questions certified from the Court of Civil Appeals, First District, in an appeal from Galveston County.

*G. E. Mann, S. M. Yeaman, W. F. Ramsey,* and *C. L. Black,* for appellants (*Kleberg & Neethe* were on brief in appellate court).—The deed to the trustees conveyed to them the title in fee simple to the 4605 acres of land, and, in effect, created a joint stock company and provided for the issuance of 1000 shares of fully paid up joint stock. Under the terms of the deed to the trustees the land became the capital of the joint stock company and the holders of the trustees' certificates became the owners of joint stock entitling them to share in the proceeds of the sale of the town lots. Scott v. Galveston City Co., 42 Texas, 535; Sibley v. Galveston City Co., 56 Texas, 269; Kobogum v. Jackson Iron Works (Mich.), 43 N. W., 602; Wells v. Green Bay Company (Wis.), 64 N. W., 69; Bedford Turnpike Co. v. Railway Co. (Tenn.), 14 Lea, 525; Owensville Turnpike Co. v. Bondurant, 54 S. W., 718; Thorpe v. Pinnock Mercantile Co., 108 N. W., 940; Hamilton v. Cushman Mfg. Co., 15 Texas Civ. App., 338; St. Paul v. Brown, 11 Minn., 254.

One who acquired the trustees' certificates issued under the terms of the deed to the trustees became not merely the owner of a one-thousandth interest in the tract of land, but became entitled to a share in the net proceeds of the sale of such land. The entire title to the land was conveyed to the trustees and they were ordered and empowered to sell the same and the rights of the shareholders were in the proceeds of the sale of the land. (Authorities the same as those cited in support of the last proposition.)

One who acquired and became the holder of the original trustees' certificates became, by the terms of the deed to the trustees, the owner and holder of fully paid up joint stock in the joint stock company

known as the Galveston City Company, and, therefore, by the terms of the act of incorporation, became a shareholder in the corporation. Scott v. Galveston City Co., 42 Texas, 535; Sibley v. Galveston City Co., 56 Texas, 269; Wells v. Green Bay Co., 64 N. W., 69; Kobogum v. Jackson Iron Works, 43 N. W., 602; Hamilton v. Cushman, 15 Texas Civ. App., 338.

The act of incorporation incorporated all persons who were stockholders in the joint stock company known and designated as the Galvestor City Company. This included all those who were holders of shares of stock, without reference to whether they held certificates issued by the joint stock company as such evidencing such ownership, or held the original trustee certificates. Scott v. Galveston City Co., 42 Texas, 535; Sibley v. Galveston City Co., 56 Texas, 269; Wells v. Green Bay Co., 64 N. W., 69; Kobogum v. Iron Co., 43 N. W., 602.

Since the deed to the trustees created the joint stock and authorized the trustees to sell the same and provided that, when a share of same was sold, the trustees should issue a certificate to the purchaser, and the holder of such certificate should become the owner and holder of a share of such joint stock, therefore the owner and holder of a trustees' certificate was, without further action on his part, a holder of a share of stock in the joint stock company created by and in pursuance of the deed to the trustees. Under the terms of the trust agreement, the trustees were empowered to issue the certificates evidencing the ownership of the joint stock and therefore a holder of a trustees' certificate was under no duty to obtain any further evidence of his title. Scott v. Galveston City Co., 42 Texas, 535; Sibley v. Galveston City Co., 56 Texas, 269.

The shares issued by the trustees under this instrument, and known as trustee stock, became, under the act of incorporation, shares of stock in the corporation. Scott v. Galveston City Co., 42 Texas, 535; Sibley v. Galveston City Co., 56 Texas, 269.

All persons who have paid for and hold shares in a corporation or joint stock company are shareholders therein, and it is not necessary that they should hold certificates issued by the corporation or joint stock company, evidencing such ownership. Certificates of shares are not the shares, but are nothing more than the corporation's or joint stock company's acknowledgment of the ownership of the shares. Therefore, since it is alleged in the petition and is undisputed that Robert Triplett paid for the five shares of stock in the joint stock company known as the Galveston City Company, and received from the trustees acting under the trust agreement a certificate therefor, and that said five shares of stock in said joint stock company were issued to him, it was immaterial that he failed to demand of the joint stock company, as such, a certificate evidencing his ownership. He became a stockholder in the joint stock company by virtue of his paying for the shares and their issuance to him, and it was not necessary that he obtain a certificate from the joint stock company acknowledging these facts. Kobogum v. Jackson Iron Works, 43 N. W., 602; Wells v. Green Bay Co., 64 N. W., 69; Scott v.

Galveston City Co., 42 Texas, 535; Sibley v. Galveston City Co., 56 'Texas, 269; Baker v. Wassam, 53 Texas, 156; Cook on Corporations, 6th ed., vol. 2, secs. 543 and 442, also vol. 1, sec. 61; Hamilton v. Cushman, 15 Texas Civ. App., 338; Armant v. New Orleans Ry. Co. (La.), 7 So., 35; Farrington v. Tennessee, 95 U. S., 687; 2 Thompson on Corporations, secs. 2520, 2523.

The two resolutions relating to the renewal of trustees' certificates constituted, not a repudiation of the trustees' certificates, but a recognition of their validity. These resolutions, by their terms, were merely adopted for the convenience of the corporation and to provide for it a complete record of its shareholders so that the dividends could be safely and accurately distributed and so that a record of the stockholders entitled to vote could be correctly kept. Neither of the resolutions evidence any intention to repudiate or forfeit the trustees' certificates if the same were not presented for renewal. On the other hand, the trustee stock was recognized as valid stock. The corporation was merely desiring it to be evidenced by certificates issued by the corporation as such. Seligson v. Brown, 53 Texas, 161; Strang v. Railway Co., 53 Texas, 169; Baker v. Wassam, 53 Texas, 150; Cattle Co. v. Burns, 82 Texas, 56; Black v. Zachary, 3 Howard (U. S.), 513; Cook on Corporations, 6th ed., vol. 2, secs. 379-381.

If the two resolutions relating to the renewal of trustees' certificates be so construed as to evidence an intention to forfeit such certificates and to repudiate and destroy the rights of the holders of such certificates if same were not presented for renewal, then said resolutions were void. Under the terms of the deed to the trustees the purchasers of the trustees' certificates became owners and holders of fully paid up joint stock in the joint stock company, and it was not necessary for them to obtain any further evidence of their title than the evidence provided to be issued in said trustee agreement. Therefore, the failure of the holders of the trustees' certificates to comply with the renewal resolutions could under no circumstances operate as a forfeiture or destruction of their rights. Wells v. Green Bay Co., 64 N. W., 69.

The fact that the certificates evidencing ownership were issued to Triplett after the trustees had, by order of the shareholders, conveyed the land to the board of directors, is not material, for it appears that the 600 shares, of which the five involved herein were a part, became, on the execution of the trust agreement, in effect, shares belonging to Menard and Triplett, to be sold for them by the trustees and the net proceeds of such sale to be delivered to them. All of the 1000 shares were issued when the trust agreement was executed, and the corporation never, at any time, had any stock for sale. Scott v. Galveston City Co., 42 Texas, 535; Sibley v. Galveston City Co., 56 Texas, 269.

The power of the trustees over the land was wholly distinct from their power over the certificates evidencing shares of stock. As to the land, they were to convey and did convey the same under directions of the shareholders to the directors of the joint stock company, but, under the trust agreement, they were, with reference to the sale of the certificates,

agents with full power of sale of Menard and Triplett, and, upon the sale of any of the certificates, were to account for the proceeds, not to the joint stock company, but to Menard and Triplett. Therefore, the fact that they had conveyed the land to the joint stock company and completed their agency, with reference to the joint stock company, had no effect on their powers to thereafter act as the agents of Menard and Triplett in the sale of the certificates. The corporation was in no way concerned as to the certificates or the sale of same. Scott v. Galveston City Co., 42 Texas, 535; Sibley v. Galveston City Co., 56 Texas, 269; Wells v. Green Bay Co., 64 N. W., 69; Bedford Turnpike Co. v. Railway Co. (Tenn.), 14 Lea, 525; Owensville Turnpike Co. v. Bondurant, 54 S. W., 718; Cook on Corporations, vol. 1, sec. 61.

It further appears that the joint stock company and the corporation have, at all times, recognized the power of the trustees to issue certificates and that the corporation has, at all times, regarded the trustees' certificates as full and sufficient evidence of the ownership of shares in the corporation, and it further appears that this has been true with reference to the trustees' certificates issued not only before but after the incorporation. Sibley v. Galveston City Co., 56 Texas, 269; Scott v. Galveston City Co., 42 Texas, 535; Wells v. Green Bay Co., 64 N. W., 69; Bedford Turnpike Co. v. Railway Co. (Tenn.), 14 Lea, 525; Owensville Turnpike Co. v. Bondurant, 54 S. W., 718; Cook on Corporations, vol. 1, sec. 61; Kobogum v. Jackson Iron Works (Mich.), 43 N. W., 602; Ware v. Galveston City Co., 111 U. S., 75; Ware v. Galveston City Co., 146 U. S., 102.

The trust agreement created 1000 shares of the joint stock and provided for its issuance and sale by the trustees and for a meeting of the shareholders and the voting of the shares at such meeting and for the organization of the company at such meeting. The meeting of the shareholders was held under the provisions of the trust agreement, and the joint stock company organized. Robert Triplett was not only a signer of the trust agreement, but was also a purchaser and holder of the certificates issued in pursuance thereof and has also been an owner, in part, of the land which comprised the chief, if not the sole asset of the concern. Therefore, it can not be said that he did not assent to the formation and organization of the joint stock company. Such assent will be implied from the fact that he signed the trust agreement providing for its organization, released and relinquished thereto his valuable property, and also became a holder of the trust certificates. Benow v. Cook (N. C.), 20 S. E., 453; Heath v. Silverthorn, 39 Wis., 146; St. Paul v. Brown, 11 Minn., 254; Talledega Ins. Co. v. Landers, 43 Ala., 115; Newton v. Carberry, 5 Cranch, C. C., 632, Federal Cases No. 10190; Atlanta v. Gas Light Co., 71 Ga., 106; Penobscott Boom Co. v. Lamson, 16 Maine, 224; Ferris v. Strong, 3 Edw. Ch., 127.

The act of incorporation incorporated the stockholders of the Galveston City Company. This included all the owners and holders of shares, and the corporation as such having been organized and having exercised its corporate powers and carried on its business for nearly

seventy years as a corporation, it can not now be heard to dispute the regularity and legality of its organization in this collateral proceeding by the assertion that some one or more of the persons to whom the charter was offered did not accept it. After the lapse of so long a time and in view of the fact that the corporation has been continuously exercising its corporate powers under the charter since its organization, it will be presumed that the charter was granted at the instance of those to whom it was granted and that all of them assented to be incorporated. Newton v. Carberry, 5 Cranch, C. C., 632, Federal Cases 10190; Talledega Ins. Co. v. Landers, 43 Ala., 115; Attorney General v. Railway Co., 35 Wis., 425; Taylor v. Newburn, 55 N. C., 141; Logan v. McAlester, 2 Del. Ch., 176; Heath v. Silverthorn, 39 Wis., 146.

Where a charter is granted certain persons conferring on them wide and valuable powers for the conduct of a purely private business for their profit it is to be presumed prima facie that the charter was granted at their instance, and that, therefore, they assented to the act of incorporation. Newton v. Carberry, 5 Cranch, C. C., 632, Federal Cases No. 10190; Taledega Ins. Co. v. Landers, 43 Ala., 115, and all cases cited to support last preceding proposition. · Also see San Antonio v. Jones, 28 Texas, 19.

When a dividend has been declared by a corporation it becomes the property of the stockholders, and is thereafter held by the corporation, and its managing officers, as trustees and as a trust fund for the stockholder. Limitation, laches or stale demand will not bar the stockholder's cause of action until the corporation, or its managing officers, repudiate the trust and notice thereof is given the shareholder. Kobogum v. Jackson Iron Works, 43 N. W., 602; Wells v. Green Bay Co., 64 N. W., 69; Bedford v. Railway Co., 14 Lea, 525; Owensville Turnpike Co. v. Bondurant, 54 S. W., 718; Cook on Corporations, 6th ed., vol. 2, secs. 543, 442; Cook on Corporations, vol. 1, secs. 61, 169; Railway Co. v. Cowell, 28 Pa. St., 329; State v. Railway Co. (Md.), 6 Gill, 363; Cyc., vol. 10, p. 566; 9 Am. & Eng. Ency. of Law, 690, 691; Cochran v. McGee, 53 S. W., 519; Machen on Corporations, sec. 1359; Galveston City Co. v. Sibley, 56 Texas, 269; Am. & Eng. Ency. of Law, vol. 26, pp. 876, 877; Morey v. Fish Bros. Co., 84 N. W., 862; Railway Co. v. Fink, 41 Ohio St., 321; Mountain Waterworks Co. v. Holme, 113 Pac., 501. Most of these cases also establish that no certificate is necessary to give one the full status and right of a shareholder. In almost every case cited, no certificate had been issued.

Robert Triplett died in 1853. The shares of stock then stood and still stand on the corporate books in his name. The corporation has made no effort to issue them to any other person or to issue any certificate to any other person for them. It appears that they have been regarded all the time as outstanding stock and have been so recognized. Until the corporation has done some act indicating an intention to control the shares and issue certificates for them to some other person and has brought notice of this fact home to the owner, limitation does not run. Owensville v. Bondurant, 54 S. W., 718; Wells v. Green Bay Co., 64

N. W., 69; Bedford v. Railway Co., 14 Lea, 525; Waterworks Co. v. Holme, 113 Pac., 501; Kobogum v. Iron Works Co., 43 N. W., 602; Railway Co. v. Fink, 41 Ohio St., 321; Morey v. Fish Bros., 84 N. W., 682; Cook on Corporations, secs. 61, 169, 442, 543, and all other authorities cited on question of limitation, laches, etc.

Plaintiffs being the owners of the stock, are entitled to the benefits of such ownership. The corporate books show the shares as outstanding in the name of Robt. Triplett. If plaintiffs can establish heirship from him, then they are entitled to all the dividends due the shares. Bedford v. Railway Co., 14 Lea, 525; Kobogum v. Iron Co., 43 N. W., 602; Wells v. Green Bay Co., 64 N. W., 69; Owensville, etc., v. Bondurant, 54 S. W., 718; Mountain Waterworks Co. v. Holme, 113 Pac., 501; Armant v. New Orleans & C. Co., 7 So., 35; Cyc., vol. 10, p. 566; Cook on Corporations, secs. 61, 169, 442, 543.

*Stewarts, E. A. Hawkins, Jas B. & Chas. J. Stubbs,* and *Williams & Stedman,* for appellees.—The court will recall that article 3358 of the Revised Statutes, adopted in 1879, prescribes the period of four years for every cause of action for which no limitation is otherwise prescribed, unless it be one "for the recovery of land." It abolished the distinction previously maintained between legal and equitable actions, prescribing a limitation for both, where formerly the latter were governed, not by the statute, but by the doctrine of laches and stale demand. McCord v. Neighbors, 101 Texas, 503-504; San Antonio National Bank v. McLane, 96 Texas, 48; Railway v. Titterington, 78 Texas, 140; Cooper v. Lee, 75 Texas, 121; Storer v. Lane, 1 Texas Civ. App., 250; Blount v. Bleker, 13 Texas Civ. App., 227; McCampbell v. Durst, 40 S. W., 815.

Not only does this statute apply to equitable actions, but it excludes from consideration excuses for delay, such as recognition, etc., formerly allowed by courts of equity in applying the doctrine of stale demand, and allows its effect to be avoided only upon the causes prescribed in the statute itself, such as infancy, insanity, etc. Chamberlain v. Boon, 74 Texas, 659; S. C., 82 Texas, 480; Storer v. Lane, supra; New York and Texas Ld. Co. v. Hyland, 8 Texas Civ. App., 201; Sheldon v. Sternberger, 25 S. W., 333.

The right asserted, however, analyzed, was neither a legal title to stock in the corporation, nor a completely executed equitable title to such stock accompanied by the possession and enjoyment of the rights and privileges of a stockholder. Taking as true the facts alleged, although after this lapse of time they can never be known to be true, the right shown was, at its best, one to demand and receive recognition as, and admission into the position and rights of a stockholder, the enforcement of which required affirmative action on the part of the owner of it through a presentation of the trustees' certificates and a demand for the issuance of renewal certificates, or other evidence of recognition as stockholders, and an action in court in case of refusal. To suits to enforce all such rights the doctrine of stale demand was always applicable, and, therefore, the four years statute is now applicable. If it be said

that this proposition requires a demand and refusal to give cause of action and that the petition does not show that this ever occurred until a short while before the suit was begun, the plain answer is found in the authorities. 25 Cyc., 1198; Wood on Limitation, 292; 19 Am. & Eng. Ency. of Law, 196, 197, 211; Clements v. Lee, 8 Texas, 374; Mitchell v. McLemore, 9 Texas, 155; Schraum v. Nolte, 1 W. & W., sec. 1156. Another view is that a demand is presumed to have been made and refused within the statutory period. Staniford v. Tuttle, 4 Vt., 82; Collard v. Tuttle, Id., 491; Raymond v. Stephenson, 4 Blackf. (Ind.), 77; Keiller v. Foster, 22 Ohio St., 27; Massie v. Byrd, 87 Ala., 672; Stanton v. Stanton, 37 Vt., 411. And in the application of the doctrine of laches courts of equity act upon the same consideration. 18 Am. & Eng. Ency. of Law, 108, subhead, "Fulfillment of Condition"; 112 subhead, "Right of Action Immature."

The accounting sought is for money and property distributed to others, ignoring plaintiffs' right, during the past thirty years. Certainly a cause of action accrued to plaintiffs when that which, according to their present claim, belonged to them was delivered to others in disregard of their rights. We need only cite the authorities. Kane v. Bloodgood, 7 Johns., Ch., 90; Re Severn Ry. Co., 1 Ch., 559; Tinnen v. Mebane, 10 Texas, 252; Commonwealth v. Springfield M. & H. Turnpike Co., 10 Bush., 254; American Loan and Trust Co. v. Grand Rivers Co., 159 Fed., 775; Armant v. N. O., etc., Ry. Co., 41 La. Ann., 1020; 5 Thompson, Cor., sec. 5374, p. 107; Clark & Marshall, Cor., 1634.

It is not denied that one may be completely entitled to become a stockholder without having actually become such, in the full sense, and that in this situation he may successfully assert many of the rights and be subjected to many of the obligations of a stockholder. What is contended for is that it is precisely this incompleteness in his title, making further action in the way of demand necessary and, in case of refusal, requiring a proceeding in the court, that subjects him to the effects of limitation and laches. Bashaw v. Eastern Union Ry. Co., 7 Hare, 114; O'Conner v. International Silver Co., 59 Atl., 325; Moore v. Silver Val. Mining Co., 104 N. C., 544; Westminster Natl. Bk. v. New England Elec. Works, 111 Am. St., 638; Cook on Corporations, secs. 13, 442; 3 Clark & Marshall, Private Corp., sec. 605; Boon v. Van Gorden, 108 Am. St., 318; Strange v. Railroad Co., 53 Texas, 169; Black v. Zachary, 3 How. (U. S.), 513; 1 Morawetz, Corporations, sec. 189; 3 Cook on Corporations, 381; 26 Am. & Eng. Ency. of Law, 997, 998; Rogers v. Northwick, 87 Wis., 414; DeCordova v. Smith, 9 Texas, 147; Smith v. Hampton, 13 Texas, 459; Carlisle v. Hart, 27 Texas, 350; Dull v. Blum, 68 Texas, 299; Watson v. Jerman, 23 Texas, 531; Clarke v. Hart, 6 H. L. Cas., 654.

The opposing view assumes that every certificate holder necessarily became a member of the unincorporated association, and that every member of that association became *ipso facto* a shareholder in the corporation. This confuses the right, or opportunity, to do a thing with the actual doing of it. The certificates were the evidence of a right in the land,

and their owners could not be compelled, without their consent, to invest it as part of the capital of a partnership. And so, partners owned interests in the property of the association which they could not be compelled to convert into the stock of a corporation. That property—the land—was never conveyed to the corporation. The mere incorporation did not change anybody's pre-existing rights and liabilities. Carothers v. Alexander, 74 Texas, 309; McCleary v. Dawson, 87 Texas, 537; Leffingwell v. Elliott, 8 Pick., 455; Holland v. Cruft, 3 Gray., 162; Manahan v. Varnum, 11 Gray., 406.

Under the principles laid down in Lechmere Bank v. Boynton, 11 Cush., 368, it is plainly competent to look to the facts as they existed when the charter was granted for the purpose of ascertaining who were stockholders in the Galveston City Company. At this distance of time this court could not say that any were except those who acted as such. Triplett never so acted in virtue of the trustees' certificates now in question, and consequently he can not be said to be a stockholder. The court will further observe the significance of the language quoted. It bears out fully the theory that it is only by consent of both subscriber and corporation that the former becomes a de facto stockholder. Other authorities clearly involve the proposition that, in determining what persons are meant by the use of such indefinite words as "associates," "shareholders," "subscribers," and the like, the facts existing before and after the granting of the charter are to be consulted. Chester Glass Co. v. Dewey, 16 Mass., 94; McGinty v. Athol Reservoir Co., 155 Mass., 185, and the cases therein cited; State v. Sibley, 25 Minn., 398 et seq. It follows that the charter did not, by its own vigor, make Triplett a stockholder in the corporation and, as he is not shown to have done anything to make himself one, the contention that he was must fail.

There can be no doubt, under the decisions in this State, that the four years statute bars an action merely to establish the former existence and loss of the certificates. Farmers Loan and Trust Co. v. Beckley, 93 Texas, 267.

Mr. Justice PHILLIPS delivered the opinion of the court.

The statement of the case as presented in the certificate of the Honorable Court of Civil Appeals is as follows:

"In the above styled cause, which is now pending in this court on appeal from the District Court of Galveston County, suit was brought by appellants, who, as successors in title of Robert Triplett, deceased, claim to be the owners of five shares of the capital stock of the Galveston City Company, a private corporation having its domicile and place of business in the City of Galveston, Galveston County, Texas. The suit is against the Galveston City Company and against Maco Stewart, the president of said company, in his individual capacity. The purpose of the suit is to establish plaintiffs' rights as stockholders of said company, to recover dividends due them as such stockholders, to set aside a sale of the lands of said company made by its board of directors to the

defendant Stewart, and to enjoin the proposed dissolution of said corporation by the majority of its stockholders.

"The petition, which covers many printed pages of the transcript, contains a full history of the organization of the defendant company, a statement of the basis upon which it was capitalized, and its original capital stock issued, the method pursued in issuing said stock, and the facts and circumstances relied upon to show a continued recognition by the defendant, up to a short time before the filing of this suit, of the rights of the owners of the stock issued to Robert Triplett as stockholders in said company.

"The facts alleged in the petition are as follows:

"Prior to April 11, 1837, M. B. Menard claimed to own the whole of the league and labor of land granted to him by the Republic of Texas, situated on the east end of Galveston Island, and Robert Triplett, for himself and for Sterling Neblett and William F. Gray, claimed to own a portion of said league and labor of land. On the date last named Menard and Triplett, who acted in the premises for himself and co-claimants, compromised their differences by a division of the land. Under this partition agreement Menard released to Triplett a specific 640 acres of the land and received from Triplett a conveyance of all of the remainder of the survey. Before this settlement was made it was the intention of all of the parties thereto to have said land subdivided into lots and blocks of varying sizes and to establish a city thereon. After this settlement was made the Triplett 640 acres was conveyed to Thomas Green, Levi Jones and William R. Johnson in trust, to be subdivided and sold for the benefit of Triplett and his co-owners, in the manner designated in said trust conveyance, and the balance of the survey was conveyed by Menard to Levi Jones in trust to be disposed of for his benefit in accordance with the terms of his trust conveyance. Acting under this deed of trust Jones, intending to execute the trust created in him by said deed, had proposed to represent the value of the said land by issuance and sale of one thousand shares of joint stock, for which certificates were to be issued to the purchasers; and in pursuance thereof, had actually issued certificates for four hundred joint stock shares, of which it was believed many shares had been sold. On the date last named a new agreement was made and entered into between the owners of the land and the trustees before named. This agreement, after reciting the facts above stated, contains the following:

" 'And, whereas, it being in the contemplation and intention of all parties to these presents, that the said league and labor of land should be laid off into lots, for the purpose of building a town thereon; and it being found most beneficial to all parties concerned, that the whole of the said league and labor of land should be held on joint account, in the proportions hereinafter specified, and should be under the control and at the disposition of the same set of commissioners or trustees, acting under common plan in regard to the whole, instead of being held partly by said Jones, and partly by the said Thomas Green, L. Jones

and W. R. Johnson, under different titles and plans, whereby injurious competition and conflicts of interests may be produced.

" 'Now, in consideration of the premises, the parties of these presents have mutually agreed and covenanted to, and with each other, as follows—that is to say:

" 'That the said league and labor, of four thousand six hundred and five acres of land, shall be conveyed to the said Thomas Green, Levi Jones and William R. Johnson, in fee simple, as trustees and commissioners to execute and carry into effect the purposes, terms and intentions of this agreement.

" 'That the said league and labor of land shall, by the said trustees or commissioners, be divided into one thousand shares, of which the four hundred shares for which certificates have already been issued by the said Jones shall be regarded as four hundred shares, and the lawful holders of the said certificates shall be on the same footing and entitled to the same rights with the holders of certificates issued under the present articles, and upon surrendering their said certificates new certificates, in lieu thereof, shall be issued by the said commissioners or trustees.

" 'That the remaining six hundred shares shall be sold by the said trustees and commissioners, in such manner as they shall think expedient; but no share to be sold for a less sum than fifteen hundred dollars, unless a majority of the said trustees should be of opinion that it would be expedient to reduce the price, a discretion therein being given to said trustees or commissioners. A certificate, signed by at least two of said commissioners, shall be issued to every purchaser who shall have a right to demand a separate certificate for each share, or may embrace any number of shares in one certificate. The certificates shall be transferable by assignment made in writing thereon and signed and sealed by the holder and acknowledged in the presence of two witnesses, before any justice of the peace or notary public.

" 'The proceeds of sale shall be applied as follows: The expense of the trust or commission shall be first deducted, and the balance shall be divided into three equal parts, of which one part shall be paid to the said Robert Triplett and those claiming under or through him, and the other two parts to be paid to the said M. B. Menard and those claiming under or through him. It is, however, agreed between the parties, that a sum not exceeding fifty thousand dollars shall be deducted out of the first proceeds of sale, after expenses paid, to be applied to the payment of a debt due from the said Menard to David White, of Mobile, Alabama, which debt is believed to be less than fifty thousand dollars; and no further payment shall be made by the trustees or commissioners, to or on account of the said Menard, or those claiming through or under him, until a proportional sum, that is to say, one-third of fifty thousand dollars, or of the sum applied to the payment of the said White, if a sum less than fifty thousand dollars should be so applied, shall have been paid to the said Triplett, or those claiming by or through him. But in case a sum sufficient to repay to the said Triplett, or those claiming by or through him, his one-third part of the money applied to the

payment of the said White, should not be raised from the sale to be made by the said trustees; then the said M. B. Menard acknowledges himself to be indebted to the said Triplett, or those claiming by or through him, to the amount of one-third of the sum so applied to the payment of the said White, and promises to pay the same. It is also expressly agreed that this stipulation for the payment of the said White is merely an agreement between the parties to these presents, and not an acknowledgment of any liability on the part of the said Triplett, or those claiming by or through him, to pay the debt due from the said Menard to the said White, or intended to create any lien in favor of the said White, or to give any security for the payment of his debt, but is subject at all times to a rescission by agreement between the said Menard and the said Triplett and of those claiming by or through them.

" 'It is further agreed, that so much of the said four hundred shares for which certificates have been issued as aforesaid, by the said Jones, as now are in the hands of said Jones, or of any of the parties to these presents, or of their agents and subject to their control, shall not be sold for less than fifteen hundred dollars per share, unless the trustees or commissioners shall determine to reduce the price of shares as afore-said, but if the price of shares shall be so reduced then the price of what remains of the said four hundred shares may likewise be reduced, it being hereby agreed that what remains of the said four hundred shares shall at no time be sold for a less price than that demanded by the trustees or commissioners for the shares sold by them. It is further agreed, that if the said Menard or those claiming through or under him, or the said Triplett, or those claiming through or under him, should choose to become purchasers of shares, the trustees or commissioners shall not demand payment in cash for their purchases but shall issue certificates to them, or either of them, and charge the same to their proportion of the amount to which they would be entitled in case the whole number of shares were sold. Provided, however, that their re-, spective purchases, so to be credited, shall not exceed the amount to which they would have been respectively entitled.

" 'The trustees or commissioners shall, as soon as in their opinion a sufficient number of shares shall have been sold, call a meeting of the shareholders, at such time and place as shall be designated by them, of which they shall give sufficient and convenient notice to the shareholders, but they shall not be bound to give other notice than by advertisement in the newspapers. At the meeting of the shareholders each share shall be entitled to one vote, and the shareholders may appear and vote by proxy. So much of the shares for which certificates have been issued by the said Jones, as aforesaid, as shall remain unsold, shall be represented by the said Menard; and so much of the six hundred shares to be sold by the trustees as shall remain unsold, shall be represented, as to two-thirds thereof, by the said Menard, and as to the other third by the said Triplett or those claiming by or through him.

" 'The trustees or commissioners shall hold the title to the said league

and labor of land by these presents vested in them, subject to the orders of the shareholders, as adopted at their general meetings, and the rules and regulations prescribed by them. They shall make all conveyances which they shall be required to make by the shareholders as aforesaid; any two of them may make conveyances and perform all other acts; and in case of the death or refusal of either of the trustees to act, the other two may appoint a third in his place by writing, under their hands and seals. The trustees shall be responsible, each, only for his own acts and receipts.

"'And any sale made by the said Jones or those appointed by him, of ten squares or parts of squares, or any less number, by virtue of the powers granted to him by the said Menard, by the deed between them as aforesaid, is hereby ratified.

"'The trustees or commissioners shall have authority to appoint all necessary agents for the sale of shares.

"'And, in consideration of the premises, the said Jones, Green and Johnson do hereby release to the said Menard and Triplett all their right and title under the aforesaid deeds and conveyances, and the said Menard and Triplett, for and in consideration of the premises and for the sum of ten dollars, to them in hand paid by the said Green, Jones and Johnson, the receipt whereof is hereby acknowledged, do give, bargain, sell, release and confirm the said league and labor of land unto them, the said Green, Jones and Johnson; to have and to hold the same to them and the survivor of them and their heirs or the survivor of them, upon trust to execute the above set forth agreement of the parties to these presents, and the said M. B. Menard, for himself, his heirs, executors and administrators, the above granted league and labor of land unto the said Green, Jones and Johnson and their assigns and the survivor and the heirs and assigns of the survivor shall, will and doth warrant and forever defend by these presents.

"'In testimony whereof the parties to these presents have hereunto set their hands and seals, the day and year first above written.'

"The following summary of the further allegations of the petition is copied from appellants' brief:

"'The trustees or commissioners at once had one thousand certificates of joint stock printed, in five books of two hundred certificates each. These books are lettered A, B, C, D and E. Books A and C were given to Jones to satisfy the 400 shares mentioned in the deed of trust. The trustees printed a circular, June 20, 1837, entitled, "Proposals for sale of stock in Galveston City." In this they recited conveyance of the 4605 acres of land "to be sold in joint stock in one thousand shares." They state that 400 shares have been disposed of, and they offer 600 at $1500 a share, ten per cent to be paid "when the whole shall have been subscribed," and when satisfactory assurance has been given for deferred payments, "certificates of stock will be issued to the subscribers, and a general meeting called to make arrangements for the sale of lots," etc.

"'The certificates issued by the trustees recite, as a preamble, that

the 4605 acres on the east end of Galveston Island are to be sold "as joint shares"; that the trustees "are to call a general meeting of the shareholders when deemed advisable." "In the proceedings of the stock- holders in general meeting, each share to be entitled to one vote, and to be represented in person or by proxy, and a majority in interest to determine all questions which may arise. The company may prescribe such rules and regulations for its government and management, and give such orders and directions to the trustees for the sale of lots, or any other purpose, as it may think promotive of general interest."

" 'The body of the certificate itself, that follows this preamble, desig- nates the interest of the grantee, naming it as "one share," giving book and number, "in the City of Galveston, to be holden and enjoyed under terms prescribed in the deed of June 15, 1837, to us as trustees."

" 'Under call duly made by the trustees, a general meeting of stock- holders, owners of the one thousand shares issued by the trustees of fully paid up, non-assessable, joint stock, whose capital was the league and labor of land, was held at Galveston, April 13, 1838, and the ma- jority of the shares voted; a directory was elected, who organized and elected M. B. Menard president. The trustees made report to this stockholders' meeting of the shares sold; the stockholders elected a sec- retary and agent of the company; directed sale of lots; made provision that shares at par of $1000 could be taken in by the company in pay for lots sold, when desired by buyer; that charter of incorporation should be applied for by the company. The stockholders' meeting called the company "Galveston City Company"; directed that as soon as charter could be had, or sooner if not had from Congress then in session, a book should be opened by secretary for "registration and transfer of stock, in modes similar to that usually adopted in the transfer of bank stock, in order that the dividends arising from sales may be correctly and rightfully disbursed and paid over to proper parties." It was further resolved that after the transfer book shall have been opened "it shall be the duty of holders of certificates to file and register them, receiving in lieu thereof a certificate under the seal of the company, stating the number of shares to which the party is entitled, which last certificate shall not be transferable except on the regular book of transfer of the company, and shall be necessary in every case to enable the shareholder to receive the dividend due him."

" 'The stockholders at that meeting further ordered the opening of a book called "Journal," in which to record all sales of lots, and when sold for stock the agent was instructed to keep a record of the shares canceled by the sales, and instructed to see to the careful preservation of the surrendered trustee certificates. The Galveston City Company has the minutes of the stockholders' meeting, and subsequent meetings to date; it has 991 of the 1000 trustee certificates that have been taken up either in sales of lots or by issuance in lieu thereof of renewal cer- tificates; it has the original stubs of "Book E of Trustee Certificates," which show the issuance to Robert Triplett of the five certificates for five shares, as hereinafter set out; it has a book entitled "Agents' Re-

ports and Stock Register, Galveston City Company," which is a record of each of the 1000 shares issued by the trustees, to whom issued, and giving the book out of which they were issued, and giving the number of each certificate and date of respective issuance. This stockholders' meeting of April, 1838, also directed the trustees to deed the league and labor of land, the capital of the joint stock company, to the directors of the company, and this order was complied with by deed of date April 12, 1839, in which it is recited that the deed is in compliance with the terms of the trust instrument of June 15, 1837, and orders of the stockholders. Under the instructions of the stockholders, the secretary and agent of the Galveston City Company promptly opened a book for transfer of stock, called "Stock Ledger," on which is registered each and every share of the trustee stock, when the trustee certificate representing the share was presented for a transfer and renewal certificate given in renewal of the trustee certificate. "The stock ledger only shows that 991 of the one thousand shares have had their original trustee certificates surrendered and renewal certificates entered on the stock ledger, and the sales of lots journal does not show that the nine shares represented by the outstanding trustee certificates have ever been bought up by the Galveston City Company for lots sold, and the nine shares, so far as the records of the company show, stand as originally issued."

" 'One of the three trustees, Levi Jones, was, in 1838, by vote of stockholders, made agent and secretary of the Galveston City Company. Annual elections were held by the stockholders in general stockholders' meetings, and the joint stock unincorporated company, Galveston City Company, was conducted from its formal organization for business on April 13, 1838, to date of incorporation, February 5, 1841, just as if the company had been incorporated; and on that day the "stockholders of the Galveston City Company were incorporated under same name and style by the Congress of the Republic." At date of incorporation, the stock ledger contained less than one-third of the 1000 shares, as no share goes on the ledger until the trustee certificate is presented for renewal, and over two-thirds of the trustee certificates had not been presented for renewal.

" 'The directory, elected by stockholders in 1840, continued on after incorporation until the annual election in 1841. The Galveston City Company, incorporated, continued on. The stockholders, owners of the 1000 shares, or so many of these shares as had not been canceled by the Galveston City Company in buying lots, voted at election of directors, at the annual meeting of the corporation. The sole business of the corporation was selling its land, its capital, in town lots.

" 'As the deed from the owners of the league and labor, Menard and Triplett, to Green, Jones and Johnson, trustees, of date June 15, 1837, and the deed from those trustees to the directory of the Galveston City Company, of date April 12, 1839, had not been recorded, to simplify title of record in dealing with third parties, a deed was, on January 1, 1842, taken direct from M. B. Menard, to the corporation and duly recorded, and is the record title as between the corporation and third

parties, although as between the stockholders and the corporation the title is as above set out.

" 'The stock of the corporation, the Galveston City Company, was for many years sold as low as $125 to $200 a share; lots were paid for almost universally in stock when the corporation sold, until about 1875. In 1856 the annual stockholders' meeting passed a resolution, and had it published in newspapers in the cities of New Orleans, Richmond, Va., and New York, to the effect that there were forty shares of the stock of Galveston City, the trustee certificates for which were still outstanding, and giving notice that until the trustee certificates were renewed the owners of the shares could neither vote their shares nor draw dividends when due thereon. In 1876 it was stated by the Galveston City Company, in an agreed statement of facts for appeal in suit of Galveston City Company v. Sibley, 58 Texas, 269, on one of the shares, the trustee certificate of which had been lost, that the Galveston City Company had canceled by sale of lots all but fifty shares of its stock, and of these fifty, ten, including the Sibley shares, were represented by trustee certificates still outstanding. To avoid any misunderstanding, the Galveston City Company in that agreed statement of facts said "that these trustee certificate shares are perfectly valid shares."

" 'In 1876 the Galveston City Company made its first distribution of net proceeds of sales, and in doing so put aside for the nine shares represented by the outstanding trustee certificates their pro rata. Some years later, when next distribution or dividend was made, under advice of eminent lawyers, it was decided that, after so great a lapse of time, chance of owners of the nine shares turning up was so remote, and the capital of the corporation was so ample, that all the money in hand could safely be distributed to and paid to the renewed certificate shares, leaving the nine lost certificate shares to get their shares of proceeds of sales of lots, when the owners of these nine shares demanded same. This policy was pursued by the corporation up to July 7, 1909, when, as accumulation of sales of several years, the corporation had on hand cash and bills receivable equivalent to $222,609.88, and the unsold land, its capital, assessed by the corporation for 1909 taxes at $187,000, and the stockholders not in directory were clamoring for a distribution to the twenty-four shares, all the remaining stock represented by renewal certificates. On advice of E. A. Hawkins, Jr., the attorney representing the corporation (and also secretary and agent of the corporation), the directory refused to make such distribution, as each of the twenty-four renewed certificate shares had received $32,500, distributed to them out of proceeds of sales of the capital, not counting in the nine trustee certificate shares, to whom nothing had been paid; and the further payment of the twenty-four shares until the same amount had been paid to the nine might make the directors personally liable to the owners of the nine shares. This being the situation, and with full knowledge of all the facts, the defendant, Stewart, at meeting of stockholders, July 7, 1909, reported he had bought out the president's stock and others at $10,000 a share, and voted as owner of fifteen shares of the twenty-four

shares entitled under by-laws to vote as the renewed certificate shares represented on the stock ledger; elected himself and his office force, a share transferred to each to qualify as director, and was elected president by his directory; and the president had passed resolutions (over protest of minority of the said voting shares) that the shares should be taken for property at a valuation of $10,000 a share; that the land, unsold, of the capital of the corporation should all be sold in four parcels at private sale on a day named less than ten days off, and adjourned the stockholders' meeting to that day; and on that day reported that there was but one bid, and that was his own of $40,000; had the sale confirmed by the vote of his majority stock (over protest of minority); had deed made, paid into the corporation for the property four shares of the stock, leaving in his, the defendant Stewart's name, and the names of his directory, eleven shares, and that the majority of the stock and the directory, dominated by the president, then passed a resolution to liquidate and dissolve the corporation on August 28, 1909, and to distribute to the then remaining eleven shares of renewed certificate stock all the cash and bills receivable, which constituted all the remaining assets of the Galveston City Company. The president then, through his directory, bought up the shares of stock represented by renewed certificates with ninety odd thousand dollars of the cash on hand of the corporation, leaving eleven shares owned or controlled by the president the only shares of the original capital stock, other than the nine outstanding trustee certificate shares.

" 'Petition alleges that the books of the Galveston City Company show that of its original capital stock of 1000 shares 980 shares have been canceled by the company for lots sold, and that the remaining 20 shares are represented, 9 shares by original trustee certificates (or were, and the certificates are lost), and the other 11 shares are represented by renewed certificates, and are owned or controlled by the defendant Stewart, the president of the corporation. That of the 9 shares, as to which the original trustee certificates have never been renewed, 5 belong to the plaintiffs, the heirs of Robert Triplett, deceased, and the other 4 shares to the respective heirs of the original persons to whom they were respectively issued, and all 9 shares stand on the books of the Galveston City Company as valid shares, part of the 1000 original shares, and after the trustee certificates representing same have been outstanding sixty odd years, there is presumption that these 9 certificates are lost or destroyed.

" 'The petition alleges search by plaintiffs for the 5 certificates and failure to find, application to the defendant corporation and denial of the president of any knowledge of there being any shares but those he owned. Petition alleges full knowledge of all facts by the defendant Stewart, and that he bought the controlling stock of the voting shares, his 15 in number, with full knowledge of all facts, and that one of the inducements of the sale of stock by the former president of the corporation made to Stewart was to avoid the responsibility of any personal liability as to the cash on hand; and petition alleges that Stewart bought

the controlling interest to get control of said cash, and intending to apply all the assets and capital to use of his shares and to deprive the 9 lost certificate shares of all property rights.

" 'Prayer is that the deed of the capital, the land of the corporation, to defendant Stewart be canceled as unlawful, because consideration is inadequate, and sale of all the capital was made over protest of the then voting shares of other than those the president controlled, and because a president can not buy from a corporation except by unanimous consent, and because the corporation was organized to sell 4605 acres of land at retail in town lots, and the remaining land can not, except by unanimous consent of stock, be sold as a whole (total capital) in bulk. Injunction is prayed as to paying any part of cash on hand to the 11 renewed certificate shares until all the 9 trustee certificate shares have received an amount equal to the amount that has been paid to each of the eleven, towit, $32,500, and that the dissolution of the corporation be enjoined; that the 5 shares, and the other 4 of the 9, be protected in their rights, and certificates issued to plaintiff for the 5 shares standing on the books of the corporation in the name of Robert Triplett, and that have stood there for nearly seventy years and no adverse claim there asserted.' . . . The following additional facts are shown by the petition and its exhibits:

"The certificates issued to Triplett and upon which this suit is based, including the preamble or notation at the beginning of the certificates, were in the following form:

" 'City of Galveston in One Thousand Shares.

" 'The proprietors, M. B. Menard, Robert Triplett, Sterling Neblett and Wm. Fairfax Gray, conveyed to the undersigned, as trustees, by their deed of the 15th of June, 1837, a league and labor of land containing 4605 acres, on the east end of Galveston Island, to be sold as joint stock in 1000 shares.

" 'By the terms of said deed certificates of shares when issued are to be assigned by endorsement under hand and seal, in the presence of two witnesses, before any justice of the peace or notary public.

" 'The trustees, any two of whom may act, are to call a general meeting of the shareholders when deemed advisable.

" 'In the proceedings of the stockholders in general meeting each share to be entitled to one vote, and to be represented in person or by proxy, and a majority in interest to determine all questions which may arise. The company may prescribe such rules and regulations for its government and management, and give such orders and directions to the trustees for the sale of lots, or any other purpose, as it may think promotive to the general interest.'

" 'Certificate of Stock. Book...... No......

" 'This is to certify that we, ................................. trustees of the City of Galveston, in consideration of................,

do grant, bargain and sell.................................his heirs and assigns forever, one share, No......, in the City of Galveston, to be holden and enjoyed by him and his assigns upon the terms prescribed in the deed bearing date the 15th of June, 1837, of M. B. Menard, Robert Triplett, Sterling Neblett and William Fairfax Gray, constituting us the trustees, and in the agreement entered into between us and the stockholders in said city, as set forth in the proposals for subscription.

" 'Witness our hands this.............................

.......................................

......................................

Trustees.'

"The proposal for subscription referred to in the certificate was as follows:

" 'Proposals for Sale of Stock in Galveston City.

" 'This property lying on the east end of Galveston Island, in Texas, consisting of 4605 acres of land, has been conveyed by the proprietors to the undersigned, Levi Jones, William R. Johnson and Thomas Green, to be sold as joint stock, in one thousand shares.

" 'As trustees they offer six hundred shares for sale, at $1500 each, and when the whole shall be subscribed, ten per cent on each share shall be payable, and the residue in six, twelve and eighteen months from that date, in equal payments. So soon as the ten per cent shall be paid, and satisfactory assurances be given for the punctual payment of the residue, certificates of stock will be issued to the subscribers, and a general meeting called to make arrangements for the sale of lots, etc.; 'four hundred shares having been disposed of without the agency of the trustees, they can sell only six hundred, and if more be taken priority of date in subscription will give preference. The conflicting claims to this valuable townsite having been adjusted, the title is offered with entire confidence as unquestionable.

" 'Levi Jones,
" 'Wm. R. Johnson,
" 'Thomas Green.

" 'Richmond, 20th June, 1837.'

"All stockholders in the joint stock company were, by the express terms of the Act of incorporation passed by the Congress of the Republic of Texas in 1841, made stockholders in the corporation. This Act is as follows:

" 'Section 1. Be it enacted by the Senate and House of Representatives of the Republic of Texas, in Congress assembled, that the stockholders in the Galveston City Company be, and they are hereby incorporated under the same name and style, and under it may transfer their rights by succession or assignment, and shall be persons in law capable of suing and being sued, pleading and being impleaded, answering and being answered unto, defending and being defended in all courts and

places whatsoever; and also that they and their successors, by the same name and style, shall be in law capable of holding and of conveying any estate, real, personal or mixed, and doing and performing all things which are necessary, and not contrary to the Constitution of this Republic.

" 'Sec. 2. Be it further enacted, that the management of the affairs of said company shall be conducted by a board of five directors, each of whom shall own at least five shares of the capital stock of said company, and three of said directors shall constitute a quorum, to do and perform all the business necessary to the successful operations of said company.

" 'A majority of said directors shall appoint a president from their own number, and fill such vacancies as may from time to time take place, from death, resignation or otherwise. The election of directors shall take place in the City of Galveston, on the first Monday in November of each and every year, and in case of failure to so elect said directors, the corporation shall not be dissolved for that cause, but the president and directors for the time being shall continue in office until there shall be an election; provided, also, that it shall be the duty of said directors to call a meeting of the stockholders, at an early day, to elect the directory so omitted to be done at the regular period.

" 'Sec. 3. Be it further enacted, that each stockholder shall have one vote for each share that he may own, and may vote in person or by proxy.

" 'Sec. 4. Be it further enacted, that the president and directors shall have authority to adopt all such rules and regulations and by-laws, as they may consider necessary for the proper management of the affairs of said company.

" 'Sec. 5. Be it further enacted, that it shall not be lawful under this Act for the company to exercise banking privileges in any form whatever.'

"At the time the Act of incorporation was passed less than half of the original trustees' certificates had been exchanged for renewal certificates issued by the stock company.

"The resolutions of the stockholders of the joint stock company before referred to passed December 31, 1838, are as follows:

" 'Ordered, that so soon as a charter of incorporation of the company can be procured (or sooner, if it is not done during the present session of Congress), the agent be required to open a book for the registration and transfer of stock in a mode similar to that usually adopted in transfer of bank stock, in order that the dividend arising from sales may be correctly and rightfully disbursed and paid over to the proper parties.

" 'Ordered, that due notice of the time of opening the books of transfer shall be given, as to which it shall be the duty of the holder of certificates to file and register them, receiving in lieu thereof a certificate under the seal of the company, stating the number of shares to which the party is entitled, which last certificate shall not be transfer-

able except on the regular books of transfer of the company, and shall be necessary in every case to enable the shareholders to receive the dividend due him.'

"At a stockholders' meeting held December 24, 1856, the following resolution was passed:

" 'Resolved, That holders of the 40 outstanding shares of Galveston City stock, issued by Levi Jones, Thomas Green and Wm. R. Johnson as trustees, and commonly known as trustee stock, shall not be entitled to draw dividends thereon or to vote either in person or by proxies, in meetings of stockholders, until they shall have surrendered the shares held by them and taken out renewed certificates, in compliance with the by-laws on that subject.

" 'Resolved, That notice of the foregoing resolution be given to nonresident shareholders by publication in the New Orleans Delta, the Richmond Inquirer and the New York Journal of Commerce.'

"Two of the five certificates upon which the claims of plaintiffs are based were, it is alleged, issued to Robert Triplett by the trustee named in the trust instrument, before set out, on the 15th day of May, 1840, and the remaining three were issued to said Triplett by said trustees on the 24th day of February, 1841.

"The deed from the trustees, Green, Jones and Johnson, to the directors of the joint stock company, executed on April 12, 1838, in addition to the recital before stated that it was executed in compliance with the terms of the trust instrument of June 15, 1837, contains the further recital that 'the said trustees for themselves and their heirs renounce and forever relinquish unto the directors aforesaid all right, title and interest which they have and hold as trustees aforesaid by virtue of the deed of trust before recited.'

"Robert Triplett died in 1853 without having disposed of said five certificates and the plaintiffs are now the owners of the estate of said Triplett and of said five certificates. The form of certificates issued by the defendant corporation is different from that of the certificates issued by the trustees.

"No share of stock was entered on the stock ledger until a renewal certificate was issued therefor in lieu of the surrendered trustees' certificate.

"In pursuance of the order of the stockholders before mentioned, the Galveston City Company, soon after its organization, adopted the policy of accepting from its stockholders shares of stock in exchange or pay for its lands and in accordance with this policy a large majority of the shares have been surrendered and canceled and there is not now more than 20 shares left uncanceled.

"It is further alleged that at the date of incorporation of the company on February 5, 1841, the owners of the 1000 joint stock shares issued by the trustees, or so many thereof 'as had not sunk their shares in payment for lots' were shareholders in the company and were all incorporated. Of the unsold shares in the hands of the trustees at the date

of the incorporation, two-thirds were owned by M. B. Menard and the other one-third by Robert Triplett.

"The trust instrument before set out recites that Triplett, Neblett and Gray were the owners of the 640 acres of land, but does not specify the proportion owned by each. The provision in said instrument for division of the proceeds of the sale of certificates requires that one-third of such proceeds shall be paid to Robert Triplett and those claiming under him.

"The allegations of the petition showing recognition by the defendant of the validity of the certificates of stock issued by the trustees and that such certificates were regarded as certificates of stock in the defendant corporation, in addition to those before set out, are as follows:

" 'Petitioners allege said trustees or commissioners continued to sell said unsold trustee shares with the approval and ratification of the directory of the corporation and of Menard and Triplett, the owners, and that the 1000 trustee certificate shares have been at all times since April 13, 1838, to July, 1909, recognized by the Galveston City Company, defendants, as shares of the capital stock of the Galveston City Company. '

" 'That defendant, Galveston City Company, filed answer in the District Court June 11, 1869, in suit of Scott v. Galveston City Company, in which answer, signed by defendant's attorney, it is recited: "That the trustees divided the entire property into 1000 shares of $1000 each; that the full amount of the capital stock (1000 shares) were issued by said trustees, and defendant company and said trustees have always openly, publicly and notoriously denied other right or interest in or claim upon said land, or stock of said company than those of the shareholders holding stock or shares issued by said trustees or shares or stock substituted therefor by defendant company."

" 'That defendant, Galveston City Company, made an agreed statement of facts in the case of Sibley v. Galveston City Co. in 1879, wherein it is stated that there then were nine other trustee certificates that had never been presented for renewal and that these nine certificates represented nine shares of what is known as trustee stock and they are recognized as perfectly valid shares of stock in the company, and that said agreed statement of facts was filed in said case.

" 'That defendant company in suit of Scott v. City Company, in 1876, and Ware v. City Company, in 1886, and Sibley v. City Company, in 1879, by pleadings and evidence of its agents and officers fully recognized said nine shares, which the company have for the past fifty years called "lost" or "mislaid" as valid shares.'

"It is further alleged: 'That Robert Triplett died testate in 1853, leaving as residuary devisees under his will three daughters, Anna M. White, plaintiff herein, Lelia, wife of George H. Yeaman, now deceased, and Virginia M. Triplett. Said Virginia M. Triplett died testate, making George H. Yeaman her residuary legatee and said will did not specifically dispose of the property herein sued for. Geo. H. Yeaman and wife, Lelia, died intestate and their estates passed to the plaintiffs

herein other than the plaintiff Anna M. White. There was no administration on Triplett's estate in Texas nor any necessity therefor.'

"The allegations as to when and how and the circumstances of the discovery by plaintiffs of their rights are as follows: 'Until August 1, 1909, petitioners had no knowledge that Triplett at the time of his death in 1853 was the owner of the certificates, nor had they knowledge of any facts that put them on notice of inquiry as to their ownership thereof. That in August last the fact was made known to them that the Stock Register and Stub of Book "E" showed that said five certificates had been issued to Triplett; in fact, all facts alleged have been acquired by and for petitioners since August 1, 1909, in connection with and of and for this suit.

" 'Defendant has not taken any steps to ascertain who the heirs of Triplett were and to advise said heirs that the books of the company had shown for many years that Robert Triplett or his heirs were owners of said five shares, but on the contrary the company had concealed said fact.

" 'Robert Triplett was a careless man and left his papers in great confusion. That search among such of his papers as petitioners can find fails to disclose said certificates, and petitioners aver that said five certificates are lost or destroyed.'

"For a further statement of the allegations of the petition we refer to the copy thereof contained in the printed record, which will be ordered sent up with this certificate.

"The defendants in the court below interposed numerous exceptions to plaintiffs' petition, all of which were sustained by the court. Among these exceptions are the following:

" '1. Defendants specially except to plaintiffs' second amended original petition, because it appears therefrom that the trustees' certificates mentioned in plaintiffs' petition were required to be surrendered and other and different certificates under the seal of the company be issued in lieu thereof, and until this was done the holder of such trustees' certificates were entitled to no rights or standing in either the joint stock association or the defendant corporation.

" '5. Defendants specially except to plaintiffs' second amended original petition, because it appears therefrom that their alleged cause of action is wholly and solely on and by virtue of certain certificates therein described, alleged to have been issued by certain trustees long after their power had ceased and after they had conveyed the entire subject of the trust to others, and because it appears from said amended petition that said trustee certificates evidenced a mere interest in certain real property which was exchangeable for interest in the joint stock company and the corporation mentioned in plaintiffs' amended petition, and which right of exchange accrued more than two years prior to the filing of this suit, and said demand is stale and is barred by laches, neglect and long delay of plaintiffs and their ancestor, and is barred by the statutes of limitation of this State, which are now specially pleaded.

" '10. Defendants specially except to plaintiffs' said amended peti-

tion alleging that plaintiffs were not advised of their ownership of said five shares, or that the books showed ownership until after July 20, 1909, because same fails to state how plaintiffs were so advised and learned the alleged showing on the books, or from whom such information was obtained, nor why such facts might not have been earlier discovered by plaintiffs; nor does it anywhere appear what steps were taken by plaintiffs or their ancestors to have made an earlier discovery of such facts.

"'20.  Defendants specially except to plaintiffs' said second amended original petition, because it appears therefrom that plaintiffs' alleged cause of action against these defendants, and that of those under whom plaintiffs claim, accrued more than two years, and more than four years, and more than ten years and more than forty years, and more than fifty years before the filing of the petition herein, and that no reasonable or sufficient cause or excuse is alleged why said suit was not earlier brought, or why all the facts therein pretended to be known were not earlier discovered; nor is it shown in said petition when, how or in what manner any discovery of fact alleged not to have been before known or to have been concealed was made by plaintiffs, nor any diligence whatever to ascertain the same, nor any excuse for the want of such diligence, nor any statement whatever as to the course of proceeding, or any facts connected with the estates of the ancestors of plaintiffs in Texas, or elsewhere, or as to the knowledge or acts of the proper legal representatives thereof in regard to the alleged rights or claims which are the subject of this suit, nor to remove the presumption that all matters relating to the alleged certificates, and on which the rights and equities thereto were dependent, were fully known to the said representatives, and these defendants submit to the court, plead and allege that plaintiffs' cause of suit herein is barred by the statutes of limitation of this State and by the lapse of time since same accrued before this suit was brought, and said statutes of limitations are now specially pleaded in bar; and further, that this suit has been delayed such a great lapse of time that all parties who might have had any knowledge of the matters in issue are necessarily long since dead, almost sixty years having elapsed since the accrual of plaintiffs' alleged rights, and the rights of the stockholders of the corporation have intervened and been permitted to grow up and become of great value, as shown in said petition, wherefore plaintiffs' cause of action is barred by such lapse of time and laches, and is stale and inequitable and ought not now to be heard in a court of equity, and the allegations as to recognition are too general and do not state any acts or facts and are mere conclusions and are insufficient.

"'23.  Defendants specially except to all those portions of plaintiffs' amended petition alleging that defendant corporation recognized and continued to recognize the rights of the holders of trustee certificates numbered 184, 185, 186, 187 and 188 of Book "E" because same fail to show how, in what manner, when or by what action defendant cor-

poration so recognized same, and of this defendants pray judgment of the court.

" '24. Defendants specially except to that part of plaintiffs' second amended petition alleging that the owner of a share of the issue of 1000 trustee certificates has been always recognized as owner by defendant corporation up to July 7, 1909, without reference to form of certificate therefor, and excepts to allegations of recognition generally, because same fails to show how or in what manner same were so recognized, and because it is elsewhere shown in said petition that defendant corporation did not recognize said trustee certificates as shares of its capital stock, but recognized same only as possessing the right to be converted into stock within a reasonable time, which has long since expired, of which defendants pray judgment of the court.

" '26. Defendants specially except to that part of plaintiffs' second amended petition setting forth the reason of the directors of the corporation for not paying dividends to the recognized stockholders of the accumulated assets of the corporation, because the reason of any director would be immaterial, and because it does not appear that same was the act of defendant corporation, of which defendants pray judgment of the court.

" '28. Defendants except to all allegations in plaintiffs' second amended petition, as to defendant corporation continuing as recognizing the trustee certificates described in said petition, and as declaring itself willing to issue stock therefor, as being too general and not stating any facts or any acts by defendant corporation that could be held to have the effect of recognizing or declaring the trustee certificates 184, 185, 186, 187 and 188, Book "E" as stock in defendant corporation, and such matters as are pleaded are insufficient to have that effect.'

"Upon hearing the appeal at the last term of this court, we held that the trial court erred in sustaining the exceptions to the petition presenting the defenses of limitation and stale demand and for that reason reversed the judgment and remanded the cause.

"Appellees have filed a motion for rehearing which is now pending in this court. A re-trial of the case in the court below will consume much time and be attended with large expense, and the record shows that several other cases involving the identical questions presented by this appeal are pending in the court below."

The questions propounded by the Court of Civil Appeals under this statement of the case are:

*"First.*

"Did the owners of trustees' certificates issued under the trust agreement before set out become by virtue of such ownership stockholders in the defendant corporation?

*"Second.*

"Does the four years statute of limitation apply to and bar plaintiffs' cause of action?

### *"Third.*

"Were the exceptions of defendants before set out asserting the defense of laches and stale demand well taken?

### *"Fourth.*

"Are the allegations as to recognition and ratification by the defendant corporation of plaintiffs' rights, and as to plaintiffs' ignorance thereof, and the time of their obtaining knowledge of their rights, when tested by defendants' special exceptions before set out, sufficient to meet the defenses of limitation and stale demand set up by defendants?

### *"Fifth.*

"If the holders of said certificates are entitled to recognition as stockholders in the defendant corporation, can they require an accounting from the corporation, or are they only entitled to their proportionate share in the assets of the corporation at the time their demand for recognition was made?"

We may say at the outset that any apparent statement of fact, in relation to the defendant company or its affairs, in the part of the opinion that follows, is to be understood as only what the petition alleges; and is so made merely to avoid repeated reference to the petition.

Before the principles of law which properly arise in this case can be applied with any degree of certainty, it is necessary to first determine what is the character of cause of action made out by the petition. The power of the District Court to now accord to the plaintiffs the relief they seek, depends, primarily, upon the nature of the right disclosed. If the allegations, accepted as true, have the force of establishing that the status of Robert Triplett was that of a stockholder in the Galveston City Company, the corporation, and the cause of action presented is for the enforcement of rights which inhere in that relation, a different rule governs in respect to the time that such cause of action will be deemed to have accrued from that to be applied if, upon the other hand, the petition reveals that, at best, he was only invested with such rights as entitled him to become a stockholder and would have established him in that relation had they been perfected, but not effective in themselves to create it. Whatever their nature, Triplett's rights arose at the outset of the company's career, seventy years before the present suit was brought; and if they were not such as to constitute him a stockholder in the corporation, the action is clearly barred and all questions are at an end. The main question in the case is, therefore, did Triplett, under the allegations of the petition, acquire the position of a stockholder in the corporation? The question of whether such relation continued, the right of the plaintiffs, as affected by limitation or laches, to now compel its recognition at the hands of the defendant company, and the other issues involved, become important only in the event it is determined that such was his status.

The league and labor of land on Galveston Island which Menard and Triplett put into their undertaking was granted to Menard by the Congress of the Republic in 1836 for the purpose of a town site. City of Galveston v. Menard, 23 Texas, 349. Following a controversy as to the title, and some attempt to carry out different plans for the creation of a company for the disposal of the land and the establishment of a city upon it that proved abortive, it appears from the petition that Menard and Triplett, acting for himself and two associates, joined their interests and executed the trust agreement of June 15, 1837, the foundation of their enterprise. Under its terms the land, which belonged to Menard and Triplett and their associates, was treated as joint capital, contributed by them as the basis of the business scheme. The legal title to the land was conveyed to three trustees, and against it the trustees were empowered to issue certificates for one thousand shares, four hundred of which were to be delivered to Jones for settlement with parties recognized as having the right to become shareholders, the remaining six hundred shares to be sold for the account of Menard and Triplett. By this agreement Menard and Triplett, in effect, converted their land into shares, of which they were the owners until sold by the trustees and to whose proceeds they were entitled on sale, the land becoming the property of the joint stock company which came into being under the operation of the agreement and its beneficial ownership becoming vested in the shareholders.

The first shareholders' meeting duly convened on April 13, 1838, a majority of the shares being represented and voting; it called the company "Galveston City Company"; elected a directory who elected a president; provided that shares at par of $1000 should be received by the company in payment for lots sold; and directed that a corporate charter be obtained. It also provided for the opening of a transfer book for the registration and transfer of stock in order that dividends might be rightfully disbursed and paid over to the proper parties; and resolved that after the opening of the transfer book "it should be the duty of holders of certificates to file and register them, receiving in lieu thereof a certificate under seal of the company, not to be transferable except upon the transfer book, and which should be necessary in every case to enable the shareholder to receive the dividend due him." This book, called "Stock Ledger," was promptly opened and used, and is now in the possession of the corporation. In it is registered every share of the stock sold by the trustees, when the corresponding certificate issued by them was presented for transfer, and a renewal certificate issued in lieu of it. It shows that of the 1000 shares sold by the trustees, trustee certificates for only 991 of such shares have been presented and surrendered for renewal certificates. There is no evidence in the books and records of the company that the nine remaining shares represented by outstanding trustee certificates have ever been absorbed by the company under its plan of taking its shares of stock in payment for lots sold by it; and so far as is disclosed by its records these remaining shares stand as originally issued. At this meeting it

was also directed that the trustees should deed the league and labor of land, which constituted the capital of the company, to the directors, which was done on April 12, 1839. From April 13, 1838, to the date of its incorporation the company was operated as if incorporated, annual elections being held by the shareholders in general stockholders' meetings.

On February 5, 1841, the joint stock company was duly incorporated by an Act of the Congress of the Republic. The petition alleges that following the incorporation the original trustees continued to sell unsold trustee shares with the approval and ratification of the directors of the company and Menard and Triplett, their owners; and that at all times since April 13, 1838, to July, 1909, the 1000 shares sold by the trustees and evidenced by certificates issued by them, have been recognized by the company as valid shares of its capital stock, different acts on the part of the company being pleaded as amounting to such recognition.

The five certificates, which constitute the basis of the suit, are of the nine outstanding trustee certificates above referred to, having been issued to Robert Triplett by the trustees, Green, Jones and Johnson, two on May 15, 1840, before the incorporation of the company, and three thereafter, on February 24, 1841.

At the date of the incorporation, according to the allegations in respect to what was shown by the stock ledger of the company at that time, less than one-third of the trustee certificates had been presented for surrender and the receipt, in lieu of them, of renewal certificates of the company, though the petition states that at the date of the first shareholders' meeting of the joint stock company, April 13, 1838, the entire 1000 trustee shares had been sold and trustee certificates issued therefor. It is evident, however, that if the full 1000 trustee shares had been sold at the date of incorporation, the entire 1000 trustee certificates had not at that time been issued therefor to the owners, as three of such certificates, of the five here involved, were issued to Triplett after that date.

Triplett's status, as the owner of five shares of stock evidenced by five original trustee certificates, whether as a stockholder in the corporation or possessed only of a right to become a stockholder by surrendering such certificates and receiving from the company its renewal certificates therefor, is to be determined by the force which may be properly given to the Act of Congress incorporating the company and the allegations of the petition that have been briefly summarized. The act of incorporation and these allegations comprehend, in a word, substantially all that occurred which may be relied upon to establish him in the legal position of a stockholder in the corporation. If thereby he became a stockholder, he continued a stockholder until his death unless that status was forfeited; and his heirs succeeded to and hold such right, unless in their hands it has in some way been lost. His and their enforcement of a stockholder's rights, if he was a stockholder in the corporation, as affected by limitation and laches, presents a distinct question, not to be confused with the immediate issue.

The Act of Congress which created the corporation did not purport to designate the persons constituting its stockholders, and gave that status to no one by name. This was probably due to the fact that the number of shareholders was large, making it preferable to denote them as a class. Whatever the reason, they were only so specified, this part of the Act reading: "Be it enacted by the Senate and House of Representatives of the Republic of Texas, in Congress assembled, that *the stockholders in the Galveston City Company be, and they are hereby incorporated under the same name and style,* and under it may transfer their rights by succession or assignment, and shall be persons in law capable of suing and being sued, etc." There can be only one conclusion drawn from the Act, and that is that it directly operated upon the class of persons named and every person included within the class, and by the force of its own terms constituted them the stockholders of the corporation. If not, the corporation was created without any stockholders, since this is the only reference to the subject in the Act. It contains no provision in regard to any capital stock, nor for subscription to it, nor to any other manner or method by which the relation of a stockholder might be created. It simply incorporated those who were shareholders in the Galveston City Company, and in so doing necessarily gave them the standing of stockholders in the corporation. The Act is the source of the company's corporate existence. . Unless it be given the effect of constituting as stockholders in the corporation the owners of shares in the joint stock company, it failed for the want of anyone upon whom it was operative as an incorporating Act, and no corporation was created.

It is plainly necessary, therefore, to look beyond the Act itself to ascertain the individuals who were "the stockholders in the Galveston City Company," that by virtue of the Act became stockholders in the corporation. If they were only such as had surrendered the trustee certificates issued as the original evidence of the company, according to the direction of the resolution passed at the meeting of April 13, 1838, above stated, reference must be had to extrinsic proof to establish who were stockholders as thus determined. And the same is true if those were included who had not exchanged their trustee certificates for renewal certificates in compliance with the resolution. While the relation of a stockholder is a contract relation and depends, of course, upon agreement and consent, this Act contains no provision requiring assent to it on the part of anyone constituted a stockholder in the corporation. As against one claiming to be within its terms, we are not warranted, therefore, in imposing any such requirement upon its provisions, but must give them the effect they properly have as found in the Act. Having been enacted for the benefit of the stockholders of the company and at their instance, as we may reasonably suppose, for the express purpose of creating a corporation constituted by themselves, without requirement of other evidence of consent, the Act can be held effective only by assent to it on their part and its creation of themselves as stockholders in the corporation thus formed, being presumed; and no sound reason can be

advanced in our opinion why such assent should not be presumed in the application of an Act of this character, where, as is here the case, nothing to the contrary is shown.

Who, then, were "the stockholders in the Galveston City Company," that by the Act were "incorporated under the same name and style," and therefore became stockholders in the corporation? Was it merely the holders of some particular form of certificate issued by the company in the character which it possessed prior to its incorporation, or the owners of its shares, however evidenced? Or bringing the question within narrower compass, was the possession of a renewal certificate, issued under the resolution of April 13, 1838, necessary to perfect ownership of a share in the company? The answer is found in the distinction which the law clearly makes between the property right which a share in such a company creates, and the evidence of it which is all that the certificate constitutes. It is found, also, we think, in the manifest intention of the parties to this enterprise not to exclude from the benefits of the Act any of those who had purchased and paid for shares in the company and were accordingly entitled to be protected in their investment, and in the evident purpose of the Act itself.

In their assumption of corporate attributes joint stock companies are governed by some of the principles that apply to corporations. In a corporation the certificate of stock is not the stock itself; it is but a muniment of title, an evidence of the ownership of the stock. It is not necessary to a subscriber's complete ownership of the stock. He becomes a full stockholder, certainly where he has performed his obligation, and possesses all of a stockholder's rights, even if no certificate is issued to him at all. Cook on Corp., secs. 13, 192; Morawetz on Corp., sec. 56. And likewise the issuance of a certificate is not essential in order to constitute membership in a joint stock company. Dennis v. Kennedy, 19 Barb., 517; Boston, etc., R. R. v. Pearson, 128 Mass., 445.

The purchasers of shares sold by the trustees and evidenced by the trustee certificates had all the standing of founders of the Galveston City Company as it stood prior to its incorporation. By their purchase of its shares they made it possible, brought it into existence, and gave it its character as a joint stock company. They were the company itself, invested with full ownership of its outstanding stock, and their status as shareholders established. The issuance of the company's renewal certificates under the resolution of April 13, 1838, added and could add nothing to their rights as stockholders; they stood at that time already complete and perfected under the law, capable of assertion and entitled to full recognition. It could only evidence their ownership of its stock in another and more immediate form, which it seems to us was the chief purpose of the resolution. There is nothing in the resolution to indicate any intent on the part of the company to declare the ownership of such shares forfeited unless the trustee certificates were exchanged for renewal certificates, if indeed any power to declare such a forfeiture of paid up shares resided in the company or its stockholders. The resolution expresses by its terms, not that this change in

the evidence of ownership of the company's shares was necessary to the completion of the right of ownership, but "to enable the shareholder to receive the dividend due him"; and it can not be held that such a declaration, though given full effect, was operative to strike down and destroy the stockholder rights of the owners of the trustee shares, whose substance consisted more of property in the shares themselves than in the incident right to dividends. Furthermore, the action of the company and its status at the date of incorporation, according to the allegations, refute the imputation of any purpose in this resolution to deny the standing of stockholders to the owners of its shares unless they obtained the renewal certificates, and demonstrate the injustice of holding that, otherwise, their status as stockholders was forfeited. The trustees, after the passage of the resolution, continued to sell the trustee shares and to issue their certificates for them, and the company recognized and treated such purchasers as valid shareholders. At the time of the incorporation, while substantially the entire one thousand shares had been sold and trustee certificates issued therefor, less than one-third of such certificates had been exchanged for the renewal certificates. If the Act of incorporation be held applicable only to the holders of certificates of the latter class, the consequence is that practically two-thirds of those who had invested in the enterprise and as a matter of right were entitled to have their investment preserved in its full integrity through the maintenance of their standing as stockholders, stood excluded from the corporation, while only a small minority of the owners of its capital stock were inducted into it and invested with possession and control.

To sanction such a result not only must there be given the resolution of April 13, 1838, a force it did not in our opinion possess, but there must be denied to the ownership of these shares the legal effect of the investment of original members of a joint stock company, or original incorporators of a corporation, in its capital stock. It is to make the standing as stockholders of such original investors dependent more upon the possession of a proper certificate, the mere evidence of their right, than the right itself; and to deprive them of the benefits of the relation which, in virtue of the acceptance of their investment, for this known and recognized purpose, the law creates rather than the stock company or the corporation imposes. As we have indicated before, this business venture had its source in these trustee shares. The trust agreement of Menard and Triplett recognizes that their ownership was to create, not merely an imperfect right to become stockholders, but a present interest and to constitute ownership of its capital stock. As a means of turning their land to profitable account and organizing the contemplated company, they contributed the land as its original capital and invited the public through the purchase of the trustee shares to become stockholders. Those who purchased had the full standing and all the rights of original subscribers to the capital stock of a corporation who have paid in their contracted contributions to its capital. In legal effect such was their relation to this joint stock company as it existed until February 5, 1841,

and to the corporation into which it was converted on that date. No principle of law is better settled than that which affirms that the payment of his subscription by an original subscriber to the capital stock of a corporation, constitutes him a stockholder, and that, as before stated, regardless of the issuance of any certificate. Thompson on Corp., sec. 1140; Fulgam v. Macon & B. R. Co., 44 Ga., 597; Rio Grande Cattle Co. v. Burns, 82 Texas, 50, 17 S. W., 1043; Wells v. Green Bay & Miss. Canal Co., 90 Wis., 442, 64 N. W., 69; Hussey v. Bank, 10 Pick. (Mass.), 414.

It will not do to say that the owners of these trustee shares stood unrecognized by the joint stock company as stockholders until they acquired its renewal certificates in lieu of the original trustee certificates, and upon that account their standing as such stockholders is to be denied. When the circumstances under which these shares were sold and the plainly evident purpose of their sale are considered, in what need did their owners stand of formal recognition by the company of their status as stockholders? They purchased their shares under a clearly expressed invitation to become original members of the enterprise. The trust agreement bound them together in the relation of owners of the joint stock. There is no question here of their being forced into the position of stockholders without the company's consent. Each purchaser of these shares was in the attitude of consenting to the relationship created by every other purchase. In their purchase the company had its origin; out of them it grew up and took its form; and it can hardly be contended that any formal recognition by the body which their ownership created was necessary either to their validity or to constitute their owners its stockholders. What was said by Chief Justice Shaw in the Massachusetts case last cited, of the status as a stockholder of a member of a corporation not even so favorably circumstanced, since he held no evidence of his right, while they held the certificates acknowledging their ownership of stock, authorized by the trust agreement forming the original articles of the company, may also be said of the position in it occupied by the owners of these shares: "The circumstance that no stock was ever formally passed to the credit of Macy in the books of the bank, could make no difference; he was an original proprietor and subscriber for ninety shares, and upon payment of his installments his title was complete, without any formal entry in the books."

That the trustees had divested themselves of the legal title to the land, which constituted the company's original capital, by conveying it to its directors, prior to their sale of the five shares in question and the issuance of their certificates, could not affect Triplett's ownership of them or his status as a stockholder. This did not revoke their authority to continue to sell the shares. The shares did not belong to the company. They belonged to Menard and Triplett for themselves and associates; they were privileged under the trust agreement to purchase them; and the trustees were their agents for the sale of them. The land was the company's original capital, but was not its capital stock, though the terms are sometimes used in the same sense. The capital stock

divided into the one thousand shares, all originally owned by Menard and Triplett, represented the land as the company's capital; but while the shares of stock on their sale became the several property of the shareholders, the land remained the joint property of the partnership in its character of a joint stock company, in the same sense that the capital of a corporation, whatever its form, remains its property, while its outstanding capital stock, representing in the form of shares the interests of the stockholders, is their property. Being the original owners of the entire capital stock Menard and Triplett for themselves and their associates continued to own the unsold shares of stock remaining at the time the land was conveyed by the trustees to the directors of the company, which was done, it may be assumed, to immediately evidence its ownership of it. To complete the sale of the remaining shares and to furnish the contemplated full complement of one thousand issued and outstanding shares of stock, it was necessary either for the company itself to take over from Menard and Triplett the unsold shares and sell them, or permit them to make the sales. According to the allegations the latter course was pursued. Under this condition, as affecting the validity of the original shares sold by the trustee for Menard and Triplett, it could make no difference whether the title to the land was at the time in the trustees or in the company.

In two previous opinions of this court it has been recognized and held that the owners of the trustee shares were constituted stockholders in this corporation. It was apparently not so determined in the light of all the questions raised here, it is true; but the relation of such shares and their owners to the corporation was so involved in each of the cases as to necessarily require consideration of its essential features for the proper adjudication of the questions before the court. In Galveston City Co. v. Scott, 42 Texas, 535, the owners of a share of stock sold by David White and evidenced by a certificate issued by him on February 2, 1857, under one of the plans initiated by Menard for the sale of the land and the organization of a company that was abandoned prior to the merger of his and Triplett's interests under the trust agreement of June 15, 1837, sought to have it established as a legal share of stock in the corporation. In determining whether it was entitled to that status, the court was naturally called upon to decide what shares of stock did become legal shares in the corporation, when created under the Act of February 5, 1841, and who became stockholders as its result. At least there can be no doubt of that being a logical method of ascertaining whether the owners of the White stock acquired any standing in the corporation, one that would strongly commend itself for the purpose and which the court was free to adopt in reaching its decision. The opinion reveals that it was one of which the court did make use in the solution of the issue, and, therefore, what was said by Chief Justice Roberts in this immediate connection can not be characterized as a dictum but properly has a positive force. Following a discussion of the trust agreement of June 15, 1837, and the issuance of certain trustee shares under it, the opinion affirms that the owners of such shares be-

came stockholders in the corporation through the incorporating Act, in the following language:

"Under this scheme the stock was disposed of, and the association was organized by the stockholders, who held what is termed the trustee stock, and by those only, who took actual exclusive possession of the land, and proceeded to carry out the objects of the association. White, Allen, Yates and others holding White stock, came into it, and received stock under it. The White scheme, as an association of stockholders, never was formed at all.

"'These were the persons who were incorporated as 'the stockholders of the Galveston City Company, under the same name and style,' on the 5th day of February, 1841, at which time there were only ten certificates of the trustee stock, of book 'A' in the hands of Menard, which, on the 7th of May, following, were issued to Origen Sibley, and William Dennis, who had bought and paid for five shares each in 1837, from White, at the rate of five hundred dollars per share. The certificate No. 153, of the trustee stock, with others, was issued by Menard, by order of the board of directors, to Dr. Jones in payment of his services."

The Galveston City Co. v. Sibley, 56 Texas, 269, directly involved one of the shares of the trustee stock, evidenced by a trustee certificate, and necessarily sustaining the same relation to the corporation as the five shares alleged in this case to have been sold to Triplett and similarly evidenced. The certificate was issued to Origen Sibley, the ancestor of the plaintiffs in the suit, on May 7, 1841, after the incorporation of the company and more than two months later than the three last certificates issued to Triplett in question here. The suit to establish the rights of the plaintiffs as the owners of a legal share of the stock in the corporation in virtue of the ownership by their ancestor of a share of the trustee stock, was brought in 1878, thirty-seven years after the issuance of the certificate. The trial court held that Sibley thereby became a legal owner of one share of the stock of the corporation with all of such rights and privileges, which was affirmed by this court with the judgment so reformed as to provide sufficient indemnity to the company. We quote from the opinion as follows:

"Under the circumstances we think such case is presented by the pleadings, which, if sustained by the testimony, should entitle the plaintiffs to relief. The issuance of the original certificate to the alleged ancestor of the plaintiffs, Origen Sibley, and that the share of stock now stands in his name on the books of the company, is not controverted. The court has found that the certificate has been lost, and that the plaintiffs, as the heirs at law of Origen Sibley, are the owners of it. Under these facts, and the presumptions arising therefrom, in our opinion, a prima facie case was made, which, in the absence of evidence to the contrary other than bare presumptions, would sustain the findings of the court, and entitle the plaintiffs to relief."

We consider the holding in these two cases as direct authority for the proposition that the owners of shares of the trustee stock to whom the trustees issued their certificates, whether before or after the date of

the incorporating Act, were thereby constituted stockholders in the corporation. It should not be overlooked that the possible effect upon their standing of the resolution of April 13, 1838, does not appear to have been passed upon in either of them, but it is manifest, we think, that its consideration would not have altered the ruling in either instance. But apart from these decisions, the question is capable of clear determination. Applying the principles we have discussed, which give to such original investment in an enterprise of this character as under the conditions here pleaded was constituted by the purchase of these trustee shares, the legal effect of full ownership of an equivalent interest in its capital stock, and confer upon such original investors, so accepted as parties to the undertaking, the relation of stockholders; as well as the just rule which regards a forfeiture with disfavor, it is clear to our minds that if Triplett, as the petition alleges, acquired the ownership of the five shares of trustee stock in question, he thereby became invested with all the rights of a stockholder in the corporation.

The petition does not, in our opinion, disclose any loss by Triplett of his status as a stockholder, or, prior to July, 1909, any repudiation by the corporation of the rights which inhered in the ownership of his stock. The allegations are to the effect that these shares have stood upon the books of the corporation as outstanding shares of its stock, and down to the time just stated their validity as such has been expressly recognized by it in various acts in relation to its affairs which are specified. The stockholders' resolution of December 24, 1856, is relied upon by the appellees as a distinct repudiation of this stock. It is given in the statement of the case, but we re-quote it here for convenience, as follows: *

"*Resolved*, That holders of the 40 outstanding shares of Galveston City stock, issued by Levi Jones, Thomas Green and Wm. R. Johnson, as trustees, and commonly known as trustee stock, shall not be entitled to draw dividends thereon or to vote either in person or by proxies in meetings of stockholders, until they shall have surrendered the shares held by them and taken out renewed certificates, in compliance with the by-laws on that subject.

"*Resolved*, That notice of the foregoing resolution be given to nonresident shareholders by publication in the New Orleans Delta, the Richmond Inquirer and the New York Journal of Commerce." The forty shares of trustee stock referred to included the five shares here alleged to have been owned by Triplett.

The resolution does not amount to a repudiation of this stock. It seems to us to have been drawn with a purpose to withhold such action, and, instead, to merely deny to its owners the privilege of voting and drawing dividends, not absolutely, it will be noted, but only until renewal certificates were taken out. These were incident rights to ownership of the stock and, of course, not unimportant in their nature; but there is a manifest difference between a mere contingent denial of their exercise and a repudiation of the right of property in the shares. The latter could subsist without any enjoyment of the privilege of voting

or receiving dividends, and, therefore, a purpose to extinguish it was not in itself indicated by the declaration of this resolution that such privilege was for a time cut off by the company.  As regards the validity of the shares, the resolution is susceptible of being construed as a distinct recognition of it.  It very plainly implies that until this action the company was making no question as to the right of these shares to participate in dividends and to be duly voted; it affirms rather than challenges their validity to that date; and indicates no intention to treat them as invalid in the future, but only to refuse them an active part in the affairs of the company until renewal certificates were obtained.  It certainly evinces no purpose to forfeit them.

In any event, if it should be conceded that the resolution amounted to a repudiation of the stock, ought simply the publication in three newspapers, in other States than that of the corporation's domicile, of such action on its part, without any evidence that the stockholder, whose interest is sought in this manner to be destroyed, ever acquired any knowledge of it, or of any other effort to bring such knowledge home to him, be held effective, as a matter of law, to put statutes of limitation in operation against a judicial proceeding for the protection of his rights?  We think not.  It must be borne in mind that, accepting the allegations of the petition as true, these were paid up shares.  The resolution does not purport to deny them the privilege. it withdrew, on account of the failure to pay any assessment to which they were lawfully subject, or on account of any default of that character.  It is claimed here to have the force of an act of repudiation based only on the failure of a stockholder to obtain from the company a different evidence of his right, of which it was bound to have already had full knowledge, as is itself expressed in the resolution.  We are unwilling to affirm that, in the absence of some statutory or charter power or express consent to that effect, a corporation has any authority to forfeit a stockholder's shares upon such a ground.  It is a trustee for the interests of its shareholders in its property, and is under the obligation to observe its trust for their benefit.  Its possession is friendly and not adverse, and the shareholder is entitled to rely upon its not attempting to impair his interest.  He is chargeable with no vigilance to preserve his stock or its fruits from appropriation by the corporation, but may confide. in its protection for their security.  And when a corporate Act is invoked as a repudiation of a shareholder's stock or a conversion of its profits, before affecting his rights with limitation it is only just to require that he or those standing in his stead have notice of it.  Grumbles v. Grumbles, 17 Texas, 472; Owingsville & Mt. Sterling Turnpike Road Co. v. Bondurant's Admr., 107 Ky., 505, 54 S. W., 718; Com. v. Springfield M. & H. Turnpike Co., 10 Bush. (Ky.), 258; Mountain Waterworks Cons. Co. v. Holme, 49 Colorado, 412, 113 Pac., 501; Bacon v. Rives, 106 U. S., 99, 1 Sup. Ct., 3, 27 Law Ed., 69.

The statute of four years limitation is applicable to the plaintiffs' cause of action, but we do not think limitation is shown by the petition.  It reveals no action of the corporation affirmatively adverse to these

shares as legal stock prior to July, 1909. Triplett is shown to have died in 1853. He left nothing among his effects to indicate his owner-ship of the stock, and the certificates originally issued to him have evi-dently long been lost. The plaintiffs had no knowledge until August, 1909, of his ownership, or that any stock certificates of any character had ever been issued as evidence of his shares in the company, according to the petition; and they allege that until that time they were in pos-session of no facts which would have put them upon inquiry. Prior to the time stated they are not shown to have had any notice of anything claimed here to have been a repudiation of the stock or a conversion of the dividends. The suit was filed November 17, 1909. As above stated, continued recognition until July, 1909, by the company of the validity of the shares, is alleged. Under the allegations of the petition they are not chargeable with laches and their suit is not barred, either to enforce their rights as stockholders, or for an accounting and the recovery of profits, or such amount as these shares would be entitled to as dividends. Cook on Corp., secs. 61, 169; Kobogum v. Jackson Iron Co., 76 Mich., 498, 43 N. W., 602; Bedford County v. Nashville, etc., Ry. Co., 14 Lea (Tenn.), 525; Morey v. Fish Bros. Wagon Co., 108 Wis., 520, 84 N. W., 862; Wells v. Green Bay & Miss. Canal Co., 90 Wis., 442, 64 N. W., 69; Mountain Waterworks Cons. Co. v. Holme, 49 Colo., 412, 113 Pac., 501; Owingsville & Mt. Sterling Turnpike Co. v. Bondurant's Admr., 107 Ky., 505, 54 S. W., 718.

The holding of these authorities is upon the principle that the trustee-ship of a corporation for its stockholders is that of an acknowledged and continuing trust. It can not be regarded of a different character. It arises out of the contractual relation whereby the corporation acquires and holds the stockholder's investment under express recognition of his right and for a specific purpose. It has all the nature of a direct trust, to which, it is generally held, statutes of limitation have no application until there is a clear and unequivocal disavowal of the trust and notice of it brought to the cestui que trust. Hunter v. Hubbard, 26 Texas, 537; Bacon v. Rives, 106 U. S., 99, 1 Sup. Ct., 3, 27 Law. Ed., 69. There can be no substantial difference between the trusteeship of a corporation as it relates to the stock of a shareholder and its duty to him in respect to the profits or dividends upon his stock. He is under no obligation to draw or demand his dividends within any prescribed period. He may leave them with the corporation if he chooses, and be under no default. The debt which a declared dividend creates on the part of the corporation to the stockholder, is one payable only on demand, as is the obligation of a bank to its depositors. It is not subject to limita-tion until there has been a demand upon the corporation and a refusal to pay. Thompson on Corp., sec. 2229. Though considered a debt, as a shareholder's dividends are payable by the corporation only on demand, its holding of them until the demand is in the nature of a trustee rela-tion; and in our opinion the same rule which requires notice to a cestui que trust of the trustee's repudiation of the trust, to set limitation in motion against him, should govern in the case of a conversion by a cor-

poration of dividends belonging to one of its stockholders. It would amount to a palpable wrong to permit the corporation, with which the stockholder may have left his dividends in confidence and trust, as he might leave his money in a bank, to bar his right by a secret appropriation of them to its own or another's benefit. Because of the position it occupies toward its stockholders and the relation that exists between them, the law ought to require and, in our judgment, does require action that is known to the stockholder, to make limitation operative under such circumstances.

We answer the first and fourth questions certified in the affirmative. The second, that the four years statute of limitation applies to the plaintiffs' cause of action, but under the allegations of the petition does not bar it. The third, in the negative. And the fifth, that under their petition the plaintiffs are entitled to an accounting from the corporation.